NATIONAL INDIAN YOUTH
COUNCIL et al., Plaintiffs,

v.

Cecil D. ANDRUS et al., Defendants.

No. 78–0586C.

United States District Court,
D. New Mexico.

Aug. 22, 1980.

John J. Kelly, Richard H. Hughes, Luebben, Hughes & Kelly, Albuquerque, N.M., for plaintiffs.

James B. Grant, Asst. U.S. Atty., Albuquerque, N.M., David C. Cannon, Jr., Dept. of Justice, Washington, D.C., for all U.S. defendants.

Victor R. Ortega and William C. Parsley, Montgomery, Andrews & Hannahs, Santa Fe, N.M., William A. Wise, Houston, Tex., for defendant–intervenor El Paso Natural Gas Co.

Rodey, Dickason, Sloan, Akin & Robb, Albuquerque, N.M., T. S. Ellis, III, and D. Alan Rudlin, Hunton & Williams, Richmond, Va., for defendant–intervenor Consolidation Coal Co.

## MEMORANDUM OPINION AND ORDER

CAMPOS, District Judge.

This litigation ensues from a surface mining (strip mining) project proposed for a tract in northwestern New Mexico on the Navajo Reservation. Plaintiffs consist of the National Indian Youth Council (NIYC), a nonprofit organization headquartered in Albuquerque, New Mexico, which characterizes its purpose as "preserving and protecting the traditional life–styles of Native American people";[1] and twelve individual members of the Navajo Tribe residing on the Reservation at Burnham, New Mexico.

1. Amended Complaint, para. 4.

Federal Defendants are officials of the United States Department of the Interior and include Cecil D. Andrus, Secretary of the Interior (Secretary), and Forrest J. Gerard, Assistant Secretary of the Interior for Indian Affairs.[2] Intervenor–Defendants are El Paso Natural Gas Company (El Paso) and Consolidation Coal Company (Consol).[3]

Plaintiffs have petitioned this Court for declaratory and injunctive relief based upon allegations that Defendants' approvals of (1) a mining lease executed in 1976 between Intervenors and the Navajo Tribe, and (2) a subsequent mining plan violate the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. Section 4321 *et seq.*; the National Historic Preservation Act of 1966 (NHPA), 16 U.S.C. Section 470 *et seq.*; Exec.Order No. 11593, 3 C.F.R. Part 154 (1971 Compilation); the Historic and Archeological Data Preservation Act of 1974 (HADPA), 16 U.S.C. Section 469 *et seq.*; 36 C.F.R. Part 800 *et seq.*; and 40 C.F.R. Part 1501 *et seq.* Plaintiffs have also alleged that the approval of the lease by Defendants constitutes a breach of a fiduciary duty owed by Defendants to the individual Plaintiffs.[4]

At the close of the evidence on Plaintiffs' motion for a preliminary injunction, the parties indicated that there would be no further evidence to present at a hearing on the merits. Thus, this Court is able to bypass the preliminary injunction issues and decide the case on its merits pursuant to Rule 65(a)(2), Federal Rules of Civil Procedure, 28 U.S.C.[5]

*BACKGROUND.* In 1959, the Navajo Tribe granted a coal prospecting permit to El Paso for exploration of 85,760 acres on the Navajo Reservation. As a result of coal discoveries El Paso and Consol, as joint venturers, entered into a lease with the Navajo Tribe in 1968 for the extraction of an estimated 678,000,000 tons of coal on 40,286 acres located on the Burnham Chapter of the Reservation.[6] The 1968 Lease was approved by the Secretary in December 1968.[7] This was prior to the passage of NEPA in 1969.

During 1970 El Paso evaluated the potential of utilizing the leasehold for a coal gasification project and in 1973 proposed to the Tribe that two coal gasification facilities be installed on the leasehold.[8] During 1973 and 1974 the Bureau of Reclamation (Reclamation), pursuant to NEPA, made environmental studies and analyses of the impacts of the proposed gasification project and alternatives. On July 16, 1974, Reclamation submitted its draft environmental

---

**2.** The other Defendants are R. Keith Higginson, Commissioner of the Bureau of Reclamation; Vincent E. McKelvey, Director of the United States Geological Survey; and William T. Whalen, Director of the National Park Service.

**3.** For clarification of further references, "Defendants" denotes only the federal Defendants and "Intervenors" denotes El Paso and Consol.

**4.** A cause of action based upon the allegation that the Secretary's approval of the mining lease was "arbitrary, capricious and an abuse of discretion" was voluntarily withdrawn by Plaintiffs prior to the preliminary injunction hearing.

**5.** Rule 65(a)(2) provides that "(b)efore or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial on the merits to be advanced and consolidated with the hearing of the application...." This consolidation can be consummated even after the preliminary injunction hearing has concluded, especially when the parties agree to such a consolidation, as did the parties in this case. *Raymond Motor Transp., Inc. v. Rice*, 417 F.Supp. 1352, 1354, n.2 (W.D.Wisc.1976), *rev'd on other grounds*, 434 U.S. 429, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978); *Wood v. National Railroad Passenger Corp.*, 341 F.Supp. 908, 914 (D.Conn.1972); *see*, 11 Wright & Miller, Federal Practice and Procedure: Civil Section 2950 (1973 ed.).

**6.** During the interval between 1959 and 1968, El Paso had entered into a lease with the Navajo Tribe to mine 8,762 acres and obtained an option to lease an additional 13,880 acres of tribal lands. Both of these leases terminated without mining activity.

**7.** The Secretary's approval of mining leases for unallotted Indian lands within a reservation is required by 25 U.S.C. Section 396a.

**8.** This proposed gasification project encompassed the entire leasehold area.

statement, DES 74–77,[9] to the Council on Environmental Quality (CEQ). DES 74–77 was also presented to other federal and state agencies and the public for review and comment. DES 74–77 addressed the environmental impacts associated with the proposed gasification project and the attendant surface mining and support activities.

In 1975, El Paso and Consol revised the proposed project, eliminating one of the gasification complexes. This revised plan divided the leasehold into two distinct mining areas. The northernmost 9,000 acres of the leasehold was designated as a thermal mine (Northern Mine), the coal from which was proposed to be used for direct commercial sale. The remaining acreage was designated as a gasification mine (Southern Mine). The production from this mine is intended to supply the coal requirements of the gasification facility.

In December 1975, Consol submitted a Mining and Reclamation Plan (1975 Mining Plan) to the United States Geological Survey (USGS), the Bureau of Indian Affairs (BIA), and the Navajo Tribe, in accordance with 25 C.F.R. Part 117. This mining plan described the revised project (ConPaso Project) and its environmental implications. The plan included, among other detail, descriptions of the proposed mining operations, the existing environment on the leasehold, potential impacts of strip mining, and measures to mitigate those impacts, including reclamation and revegetation associated with the ConPaso Project.

In 1976, the 1968 Lease was renegotiated between the Tribe and Intervenors. The revised lease (1976 Lease) encompassed the identical 40,286 acres of its predecessor but increased the Tribe's control over the operations, increased the financial benefits accruing to the Tribe, guaranteed preferential employment on the project for Tribe members, and designated certain procedures to be followed to protect the environment and paleontological and archeological resources on the leasehold. The 1976 Lease was executed on August 26, 1976.

On February 8, 1977, Reclamation issued its final environmental statement on the project, FES 77–03. FES 77–03 mentioned, but did not discuss, the changes in the proposed project that had occurred since the filing of DES 74–77.[10] Reclamation did note in FES 77–03 that a subsequent environmental impact statement (EIS) would be prepared by BIA which would address the 1976 Lease and the 1975 Mining Plan and the environmental impacts of the ConPaso Project as revised.

The draft environmental statement issued by BIA, DES 77–04,[11] was submitted to CEQ on February 9, 1977. DES 77–04 was issued as a supplement to FES 77–03.[12] Following circulation for review and comment among the federal and state agencies and the public, BIA filed the final environmental statement, FES 77–13, on May 11, 1977.[13] On July 1, 1977, the Tribe approved the 1975 Mining Plan. Shortly thereafter, the Secretary gave the Office of Surface Mining (OSM) the assignment of reviewing the 1975 Mining Plan and making recommendations as to its approval.[14]

---

**9.** Entitled "El Paso Coal Gasification Project."

**10.** FES 77–03 differed from its draft version, DES 74–77, in that FES 77–03 discussed the environmental impacts of gasification for the project as revised in 1975. However, the scope of FES 77–03 was confined to the gasification phase of the revised project and the Southern Mine. It did not address the environmental impacts expected from the operation of the Northern Mine.

**11.** Entitled "Navajo–El Paso/Consolidation Coal Lease and Mining Plan, Navajo Reservation, San Juan County, New Mexico."

**12.** DES 77–04 discussed the environmental impacts associated with both the Southern and Northern Mines, the 1975 Mining Plan, and the 1976 Lease.

**13.** FES 77–13 had the identical scope of DES 77–04.

**14.** On August 3, 1977, the Surface Mining Control and Reclamation Act of 1977 (SMCRA), 30 U.S.C. Section 1201 *et seq.* was enacted. SMCRA created the Office of Surface Mining Reclamation and Enforcement and invested it with the responsibility of supervising surface mining and reclamation in the United States.

On August 31, 1977, the Secretary approved the 1976 Lease based upon the information contained in FES 77–03 and FES 77–13. On October 23, 1978, Consol submitted a Restructured Mining and Reclamation Plan (1978 Mining Plan) to OSM. This revised mining plan was required by OSM after its examination of the 1975 Mining Plan. The 1978 Mining Plan addressed only the proposed mining operations and impacts for the Northern Mine. This Plan was subsequently approved by the New Mexico Coal Surface Mining Commission, the Tribe, USGS and BIA. On August 27, 1979, OSM issued an Environmental Assessment (EA) of the Plan. The EA was revised and reissued on November 2, 1979.

On January 11, 1980, Assistant Secretary Gerard issued a "Finding of No Significant Impact" (FONSI) with regard to the 1978 Mining Plan. The 1978 Mining Plan was given final approval that same day.

In Count One, Plaintiffs allege that the two FESs prepared in this case are inadequate, thereby violating NEPA. The four specific deficiencies propounded by Plaintiffs are (1) failure to adequately discuss the potential for unsuccessful land reclamation, (2) failure to adequately discuss other alternatives to the proposed action, (3) failure to adequately investigate and discuss the significance of archeological and paleontological resources on the leasehold, and (4) the failure to adequately discuss the human impacts upon the residents of the Burnham area.

Several threshold issues must be resolved before the adequacy of the environmental impact statement record (EIS record) can be addressed. First, there is an issue as to whether the 1979 CEQ regulations are applicable in this case.[15] Second, there is a question as to what constitutes the EIS record upon which the NEPA–related issues should be decided. Third, there is an issue as to whether NEPA was violated by the Assistant Secretary in finding that no supplementation of the EIS record was required prior to the approval of the 1978 Mining Plan.[16]

The preliminary disposition of these three interrelated subissues is necessary for a proper resolution of the NEPA issues, although this method of analysis will require the Court to follow a somewhat regressive chronology.

■ *APPLICABILITY OF THE 1979 CEQ REGULATIONS.* The CEQ Regulations, 40 C.F.R. Parts 1501, *et seq.*, are the detailed embodiment for NEPA through which its purposes are implemented. The revised regulations were designated effective July 30, 1979, subject to the following qualifications and exceptions:

> These regulations shall apply to the fullest extent practicable to ongoing activities and environmental documents begun

15. The CEQ regulations were effective as of July 30, 1979. 40 C.F.R. Part 1506.12 (1979). Plaintiffs contend that the Environmental Assessment and the Secretary's approval of the 1978 Mining Plan were controlled by the 1979 regulations.

The determination as to whether the 1979 regulations are applicable in this case is important not only for ascertaining the appropriate regulatory content, but also for ascertaining the force of that content. Antecedent versions of the 1979 regulations were only advisory guidelines whose force was characterized by the United States Supreme Court as "nonbinding advice." *Andrus v. Sierra Club*, 442 U.S. 347, 358, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979). However, in 1977 President Carter issued Executive Order 11991, 3 C.F.R. Part 124 (1978 Compilation), directing CEQ to "issue regulations to Federal agencies for the implementation of the procedural provisions of the Act

(NEPA)...." Section 1(h). The Order also required agencies proceeding under NEPA to "comply with the regulations issued by the Council (CEQ) except where such compliance would be inconsistent with statutory requirement." Section 2(g).

The Supreme Court has stated that these 1979 regulations, unlike those that preceded them, impose mandatory compliance obligations on federal agencies operating pursuant to NEPA. *Andrus v. Sierra Club*, 442 U.S. at 358, 99 S.Ct. at 2341.

16. The Assistant Secretary's conclusion that supplementation of the FESs was unnecessary was formally published as a "Finding of No Significant Impact: Consolidation Coal Company Restructured Mining and Reclamation Plan Approval, Navajo Burnham Mine" issued January 11, 1980, contemporaneously with the Mining Plan approval.

before the effective date. These regulations do not apply to an environmental impact statement or supplement if the draft statement was filed before the effective date of these regulations. No completed environmental documents need to be redone by reason of these regulations.... However, nothing shall prevent an agency from proceeding under these regulations at an earlier time. 40 C.F.R. Part 1506.12(a) (1979).

Plaintiffs contend that the Assistant Secretary's FONSI and the EA prepared by OSM to aid the Assistant Secretary in making the supplementation decision are subject to review under the 1979 regulations. Defendants and Intervenors contend that the new regulations are not applicable to this case because FES 77–03 and FES 77–13 were filed prior to the effective date.

FES 77–03 and FES 77–13 were both filed prior to July 30, 1979, and are, themselves, exempt from scrutiny under those provisions; however, the corollary urged by Defendants and Intervenors that subsequent activities, especially those surrounding the mining plan approval, are also excluded from the purview of the revised regulations is defective. The first sentence of Part 1506.12 clearly states that the 1979 regulations are to be applied to "the fullest extent practicable to ongoing activities and environmental documents begun before the effective date." Both the FONSI and the EA are "environmental documents" within the meaning of 40 C.F.R. Part 1508.10 (1979). The EA was begun on June 11, 1979, only seven weeks before the effective date.[17] It was not completed until November 2, 1979, over three months after the 1979 regulations became effective. The FONSI was not issued in finality until January 11, 1980, over five months following the implementation of the new regulations.

Defendants and Intervenors have failed to submit any evidence as to why it would not have been "practicable" to apply the 1979 regulations to the EA and the FONSI. On the contrary, the evidence and the provisions of Part 1506.12(a) compel the conclusion that not only was it "practicable" for OSM and the Assistant Secretary to apply the new regulations to the preparation of the EA and the FONSI, it was mandatory.

More important, the FONSI states on its face that it was prepared "pursuant to 40 C.F.R. Part 1508.13 (1979)...." Also, in the notice of OSM's recommendation of approval of the mining plan issued on September 24, 1979, it indicates that it was being published "(p)ursuant to Section 1506.6 (1979) of Title 40, Code of Federal Regulations...."[18] 44 Fed.Reg. 51711 (1979). This was over five weeks before the final submission of the EA.

Even if Defendants and Intervenors could argue successfully that the Assistant Secretary could not have been compelled to comply with the 1979 regulations with regard to his FONSI, the force of that argument vanishes with the Assistant Secretary's acquiescence in "proceeding under these regulations at an earlier time." Therefore, the Assistant Secretary's decision that a supplemental EIS did not have to be prepared and considered prior to his approval of the 1978 Mining Plan is reviewable under the 1979 version of the regulations, as is the EA.

■ *COMPOSITION OF THE EIS RECORD.* At this stage of the analysis, it becomes necessary to discuss the makeup of the EIS record relative to which the NEPA issues will be decided. Defendants and Intervenors contend that the EA is, in essence, equivalent to an EIS or a supplement to an EIS and that, therefore, the EIS

**17.** Defendants and OSM were given notice of the July 30, 1979, effective date and content of the 1979 regulations–including the applicability of the revised regulations "to the fullest extent practicable to ongoing ... environmental documents begun before the effective date"–on November 29, 1978, when these new regulations were published in the Federal Register. 43 Fed.Reg. 55978–56007 (1978). This notice was given over six months before the EA was even begun and over thirteen months before the FONSI was issued.

**18.** 40 C.F.R. Part 1501.4(e)(1) (1979) requires that a "finding of no significant impact (be made) available to the affected public as specified in Part 1506.6."

record in this case is a triology composed of FES 77–03, FES 77–13 and the EA. In effect, Defendants and Intervenors are seeking to have the Court hold that this EA is a supplement to the FESs. For the reasons discussed subsequently it is concluded that the EA is not a part of the EIS record.

The status to be given this EA must be determined with reference to the basic function of NEPA and the roles played by the EIS, the supplement and the EA in the implementation of that function. The fundamental function of NEPA was recently discussed by the Court of Appeals of the Tenth Circuit. It is the discharge of an obligation that "before an agency takes major action it must have taken a 'hard look' at the environmental consequences (associated with that action)." *Environmental Defense Fund, Inc. v. Andrus*, 619 F.2d 1368, 1378 (10th Cir. 1980); *see Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576, 590 n. 21 (1976). Section 102(2)(C) of NEPA requires the preparation of an EIS whenever federal agencies engage in "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. Section 4332(2)(C).

■ The EIS's primary role is an "an action–forcing device to insure that the policies and goals defined in (NEPA) are infused into the ongoing programs and actions of the Federal Government." 40 C.F.R. Part 1502.1 (1979); *see, Andrus v. Sierra Club*, 442 U.S. at 350–51, 99 S.Ct. at 2337–2338. In other words, the EIS functions as a "lens" through which NEPA compels a decision–making agency to take the "hard look" at the environmental impacts of a proposed action. *See, Environmental Defense Fund*, 619 F.2d at 1375.

The role of the supplement is coincident to that of the EIS. A supplement is only required when it is necessary to update an existing EIS because of either "substantial changes in the proposed action" or the development of "significant new circumstances or information" pertaining to that action or its impacts. 40 C.F.R. Part 1502.9(c)(1) (1979). The revised EIS record, consisting of the original EIS and the supplement, becomes a more refined environmental "lens" through which the responsible federal agency must take *another* "hard look" at the environmental impacts of a proposed action. The supplement's function then is on an equivalent plane with the function of an EIS.

The EA, by comparison, plays a dual role in NEPA compliance that differs markedly from the roles of the EIS and the supplement. First, the EA is intended as a prelude to an EIS which surveys a proposed project for the purpose of determining whether that project comes within the purview of Section 102(2)(C), thereby requiring the preparation of an EIS. *See*, 40 C.F.R. Parts 1501.4 and 1508.9(a) (1979).[19] When this preliminary determination has been made, the EA performs a second, disjunctive function to either "(f)acilitate preparation of (an EIS) when one is necessary," 40 C.F.R. Part 1508.9(a)(3) (1979), or facilitate preparation of a "finding of no significant impact (Part 1508.13), if the agency determines on the basis of the environmental assessment not to prepare (an EIS)." 40 C.F.R. Part 1501.4(e) (1979); *compare* 40 C.F.R. Part 1508.9(a)(2) (1979) *with* 40 C.F.R. Part 1508.13 (1979). It is apparent under these regulations that an EA is not the functional equivalent of an EIS or a supplement. Of course, if a particular EA did, in actuality, fulfill the function of the

**19.** 40 C.F.R. Part 1501.4 (1979) states:
In determining whether to prepare an environmental impact statement the Federal agency shall:

\*    \*    \*    \*    \*    \*

(b) . . . prepare an environmental assessment (Part 1508.9).
(c) Based on the environmental assessment make its determination whether to prepare an environmental impact statement.

40 C.F.R. Part 1508.9(a) defines "Environmental Assessment" as:
a concise public document for which a Federal agency is responsible that serves to:
(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact.

EIS or supplement, the Court would have no difficulty in considering such a misnomered document as the functional equivalent of an EIS or supplement.

Besides the functional disparity between the EIS and the supplement, on the one hand, and the EA, on the other, there is a concomitant procedural disparity between these documents as well. The EIS is subjected to a rigorous procedure under the regulations. The regulations impose exacting requirements for format and content.[20] A supplement, with only a few exceptions, is also required to comply with these same procedural mandates. 40 C.F.R. Part 1502.-9(c)(4) (1979). In contrast, the EA need only comply with minimal procedural conditions. *See*, 40 C.F.R. Part 1508.9(a)(2) (1979). Procedural requirements in the regulations concerning the formulation of an EIS or a supplement are not mere *pro forma* technicalities. They set forth the procedure for environmental documentation (such as for the EIS) through which NEPA's mandate is enforced.[21]

█ To preserve the efficacy of NEPA, it is necessary that courts demand *"strict compliance* with the disclosure and *procedural provisions* of the Act." *Warm Springs Dam Task Force v. Gribble*, 565 F.2d 549, 552 (9th Cir. 1977) (emphasis added). Courts must also insist on strict adherence to the CEQ regulations through which NEPA's mandate is administered. Therefore, before a document designated as an EA can be considered the equivalent of an EIS or supplement, it must not only fulfill the function of an EIS or supplement, it must also strictly comply with the procedural requirements for preparation of an EIS or supplement.

A review of the history of this EA indicates that it was never intended to function as a supplement to the FESs. Rather, its purpose was to "(b)riefly provide sufficient evidence and analysis for determining whether to prepare an (EIS or supplement) or a finding of no significant impact" regarding the changes in the project as proposed in the 1978 Mining Plan. *See*, 40 C.F.R. Part 1508.9(a)(1) (1979). The Assistant Secretary reviewed the EA to determine whether NEPA required that the FESs be supplemented before the revised mining plan could be approved. "(O)n the basis of the (EA) ...", 40 C.F.R. Part 1501.4(e) (1979), the Assistant Secretary agreed with the conclusion drawn by OSM that any "significant impacts that could ensue from the (approval of the 1978 Mining Plan) have been addressed in (FES 77–03 and FES 77–13)." 44 Fed.Reg. 51711 (1979). This means that the Assistant Secretary concluded that a supplement was not required for the mining plan approval and so he decided "not to prepare (an EIS or supplement)." 40 C.F.R. Part 1501.4(e) (1979). He then executed the FONSI as required under the regulations. *Id.* The Assistant Secretary's "Finding," then, was simply a finding that the FESs provided adequate environmental documentation of the impacts of the 1978 Mining Plan and that it was not necessary under NEPA to take another "hard look" at those impacts.

The format and content of this EA shows that it did not track the procedural path of an EIS or a supplement to an EIS. First, the EA's format does not comply with the required format for an EIS as set forth in 40 C.F.R. Part 1502.10 (1979). Second, the notice given by OSM in the Federal Register allowed only 20 days for commenting on the EA, whereas the minimum comment period for an EIS is 45 days.[22] 40 C.F.R. Part 1506.10(c) (1979). Third, if the EA had been the procedural equivalent of a supple-

---

**20.** *See*, 40 C.F.R. Parts 1501.7, 1502.2, 1502.4–25, 1503.1–4, 1505.1–3, 1506.2, 1506.3, 1506.5–7, 1506.9 and 1506.10 (1979).

**21.** The United States Supreme Court has stated that NEPA's "mandate to the agencies is essentially procedural." *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978); *ac-*

cord, *Strycker's Bay Neighborhood Council v. Karlen*, 444 U.S. 223, 228–229, 100 S.Ct. 497, 500, 62 L.Ed.2d 433 (1980).

**22.** This is merely an innocuous technicality because on September 24, 1979, OSM extended the comment period to fifty days. *See*, 44 Fed.Reg. 55070 (1979).

ment, then OSM should have "(o)btain(ed) the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved or which is authorized to develop and enforce environmental standards." 40 C.F.R. Part 1503.1(a)(1) (1979); *accord*, 42 U.S.C. Section 4332(2)(C). No comments were made by any federal agencies on the proposed 1978 Mining Plan other than by the National Park Service whose "comment" was not really a comment as defined in 40 C.F.R. Part 1503.3(a) (1979), but was, rather, an "archeological clearance" submitted to further the project's compliance with the provisions of the National Historic Preservation Act of 1966, 16 U.S.C. Section 470 *et seq.*[23] By comparison, there were extensive comments from federal agencies included in both FESs. *See*, FES 77–03, Vol. II at pp. 10–1 through 111 (19 agencies commented); FES 77–13 at pp. 9–9 through 35 (11 agencies commented). Fourth, the substantive comments received (from other than federal agencies) were never officially "attached to the final (EA) . . ." as required by 40 C.F.R. Part 1503.4(b) (1979). Fifth, the EA was never filed with the Environmental Protection Agency (EPA) as is required for all EISs by 40 C.F.R. Part 1506.9 (1979). This particular omission is very critical because, under Section 309 of the Clean Air Act, 42 U.S.C. Section 7609, the EPA has a duty to "review and comment in writing on the environmental impact of any matter . . . to which (Section 102(2)(C) of NEPA) applies. . . ." Sixth, there is no record that "(t)he Environmental Protection Agency (published) a notice in the Federal Register . . ." of the EA as it is required to do for all EISs and supplements. *See*, 40 C.F.R. Part 1506.10(a) (1979). This means that the notice published by OSM is tainted because the notice did not come from the proper authority–the

EPA. *See*, 40 C.F.R. Part 1506.10(a), (b) (1979). Seventh, the EA was not prepared in "draft" and "final" versions as required for an EIS and supplement. *Compare* 40 C.F.R. Part 1502.9(a), (b) (1979) *with* 40 C.F.R. Part 1502.9(c)(4) (1979). Eighth, there were no public hearings held on the EA as there were for FES 77–03 and FES 77–13. That which prompted public hearings in connection with FES 77–03 and FES 77–13 would seem to have dictated, under present criteria, public hearings on the EA if the latter was intended as a supplement. *See*, 40 C.F.R. Part 1506.6(c)(1) (1979). The evidence indicates that this EA is neither the functional equivalent nor the procedural equivalent of an EIS or supplement. Therefore, the EIS record which this Court will review to determine if there was adequate NEPA compliance for the approval of the 1978 Lease approval and the 1978 Mining Plan approval consists solely of FES 77–03 and FES 77–13.

■ *THE DECISION NOT TO SUPPLEMENT THE EIS RECORD.* The final preliminary matter to be resolved before the adequacy of the EIS record is addressed revolves around the Assistant Secretary's FONSI prepared pursuant to Part 1508.13.[24] This document was issued as a formalized finding that no further supplementation of the EIS record was necessary before the 1978 Mining Plan could be approved. The FONSI concluded that "approval of the Restructured Mining and Reclamation Plan does not constitute a major Federal action having a significant effect of the human environment for which there has not already been adequate compliance with the National Environmental Policy Act, 42 U.S.C. Section 4321, *et seq.*" Plaintiffs challenge both the utilization by the Assistant Secretary of Part 1508.13 for document-

---

**23.** To illustrate the importance of this particular procedural requirement, the Ninth Circuit recently held that the failure of the Army Corps of Engineers to obtain the comments of only one federal agency (USGS) for a supplement to an EIS constituted a violation of NEPA. *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1022 (9th Cir. 1980).

**24.** Part 1508.13 (1979) defines a FONSI as "a document by a Federal agency briefly presenting the reasons why an action, not otherwise excluded (from NEPA compliance), will not have a significant effect on the human environment for which an environmental impact statement therefore will not be prepared. . . ."

ing his decision not to supplement and the decision itself.

Plaintiffs' contention that the Assistant Secretary erred in proceeding to document his negative supplementation decision with a FONSI is based upon their interpretation of 40 C.F.R. Parts 1501.4(e) (1979) [25] and 1508.13. They would confine the applicability of Part 1508.13 to the threshold decision that a proposed action is not "major Federal action" under Section 102(2)(C) of NEPA. They argue that when such a negative determination has been made a FONSI is prepared, upon completion of which Part 1508.13 ceases to have any further applicability to that action. Plaintiffs maintain that if the threshold decision is made in the affirmative, meaning that an EIS must be filed, then Part 1508.13 can never have any application or serve any function in that action.

Intervenors contend that Part 1508.13 is applicable not only when the threshold determination is made that a proposed action is not governed by NEPA, but also when a decision is made not to supplement an existing EIS.[26]

40 C.F.R. Part 1502.9(c)(1) (1979) sets forth a dual standard which agencies are to apply when deciding whether to supplement an EIS record.[27] Both Plaintiffs and Intervenors agree that Part 1502.9(c)(1) provides the exclusive criteria for a supplementation determination. These parties also agree that if the supplementation decision is in the affirmative then a supplement must be prepared in accordance with the procedure designated for an EIS. *See,* Part 1502.9(c)(4). The parties disagree, however, as to what procedure follows a decision not to supplement.

Plaintiffs contend that the agency is precluded from utilizing a FONSI to document its decision not to supplement. Intervenors maintain that when there has been a decision not to supplement the agency must follow the same procedure required for a threshold decision that no EIS will be prepared for an action because it does not constitute a Section 102(2)(C) "action". This interpretation would require that an agency prepare a FONSI whenever a decision not to supplement is made.

Plaintiffs' argument is based upon a very constricted reading of the regulation. It is true that no reference is made in Part 1508.13 to a "supplement", nor is there any cross reference between Parts 1502.9(c)(1) and 1508.13. Also, Part 1501.4(e), which states when a FONSI must be prepared, refers only to a "statement"–presumably an EIS. It does not follow, however, that an agency *cannot* comply with this provision when a decision not to supplement is reached. Furthermore, it is true that a decision not to supplement under the standard of Part 1502.9(c)(1) is not technically a FONSI. Meticulous precision might suggest a finding of no "substantial changes" nor "significant new circumstances or information" which are "relevant to environmental concerns" since the preparation of the latest EIS. *See,* Part 1502.9(c)(1).

Intervenors' rationale is that a supplement is an EIS as referred to in Part 1508.11 and defined in Part 1508.12. Thus, they claim, the procedures for an EIS must be followed. These include preparation of a FONSI when a negative determination is made regarding environmental impact of an action. *See,* Part 1501.4(e).

Although ambiguity attends the regulations with respect to this particular issue, the Court believes that it is more consistent with the intent of the regulations and with the purposes of NEPA to allow an agency

---

**25.** Part 1501.4(e) (1979) states that an agency will "(p)repare a finding of no significant impact (Part 1508.13), if the agency determines . . . not to prepare (an EIS)."

**26.** Defendants, having stated that the 1979 revision of the CEQ regulations are not applicable to this lawsuit, did not discuss this issue.

**27.** Part 1502.9(c)(1) (1979) provides for the mandatory supplementation of an EIS record when "(i) (t)he agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) (t)here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

to formally document its reasons for not supplementing an EIS through a FONSI, as was done in this case.

The Court's conclusion is based upon the following rationale. First, a determination not to supplement an EIS is "very similar" to a determination not to prepare an EIS at the outset. *Monarch Chemical Works, Inc. v. Thone*, 604 F.2d 1083, 1087 (8th Cir. 1979). Second, a decision to supplement must be implemented through the same procedure which is required when there is a decision to prepare an EIS initially. *See*, Part 1502.9(c)(4). Third, one of NEPA's secondary functions, enforced primarily through the EIS and supplement, is that of public disclosure. *E. g., National Helium Corporation v. Morton*, 486 F.2d 995, 1002 (10th Cir. 1973), *cert. denied*, 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974); *Com. of Mass. v. Andrus*, 594 F.2d 872, 883 (1st Cir. 1979); *see*, Parts 1502.1 (1979) and 1506.6 (1979). It furthers the purpose of the disclosure function to allow an agency the discretion to document a decision not to supplement with a FONSI.[28] Fourth, no other "environmental document" specifically provided for in NEPA or the Regulations (40 C.F.R. Part 1508.10 (1979)) is designed to discharge the disclosure function for the reasons underlying the decision not to supplement. *See*, Parts 1502.2(g) (the EIS); 1508.9 (the EA); 1508.13 (the FONSI); 1508.22 (the "notice of intent").

Upon the foregoing, the Court concludes that when an agency reviews an EIS pursuant to Part 1502.9(c)(1) and reaches a decision not to supplement it, that agency *may* choose to issue a FONSI to document the grounds for that decision.[29]

Plaintiffs contend that in this case the Assistant Secretary did not apply the standard of Part 1502.9(c)(1) in his decision not to supplement, but that he erroneously applied the standard of Part 1508.13. This attack is based upon the Assistant Secretary's statement in the FONSI that "approval of the (1978 Mining Plan) does not constitute a major Federal action *having a significant effect on the human environment for which there has not already been adequate compliance* with the National Environmental Policy Act" (emphasis added). Plaintiffs cite the Assistant Secretary's use of the phrase "having a significant effect on the human environment" as evidence that he employed an erroneous standard. This is the standard found in Part 1508.13 (which, in turn, reiterates the standard imposed by Section 102(2)(C)), *See*, 42 U.S.C. Section 4332(2)(C)). The Court concludes, however, that the modifying phrase "for which there has not already been adequate compliance with the National Environmental Policy Act" brings the Assistant Secretary's conclusion within the standard of Part 1502.9(c)(1). From another, but yet reasonable, perspective, the Assistant Secretary's statement inferentially says that there exist no "substantial changes" nor "significant new circumstances or information" which require a supplement under Part 1502.9(c)(1).[30] Therefore, the Court concludes that the Assistant Secretary followed an acceptable procedure in formulating and announcing his decision not to supplement. The merits of that determination will now be reviewed.

The standard of review of an agency's determination that further supplementation of an EIS is not required by NEPA is the same standard which is applied to review an initial determination that an EIS is not required for a particular action. *Warm*

---

**28.** Other "environmental documents", as designated in 40 C.F.R. Part 1508.10 (1979), allow an agency discretion to prepare "environmental documents" when the agency determines that the purposes of NEPA will be furthered by doing so. Parts 1501.3(b) (discretionary preparation of an EA); 1502.9(c)(2) (discretionary preparation of a supplement); *see* Part 1501.- 3(a) (discretionary preparation of an EIS).

**29.** Note that the Court is not holding that an agency *must* prepare a FONSI whenever it makes a decision not to supplement. Such a holding is not required on the facts in this case.

**30.** This is consistent with OSM's statement in its Federal Register notice that "significant impacts that could ensue from the proposed (1978 Mining Plan approval) have been addressed in (FES 77–03 and FES 77–13)." 44 Fed.Reg. 51711 (1979).

*Springs Dam,* 621 F.2d at 1024; *Monarch Chemical,* 604 F.2d at 1087. The reason why the same standard is applied is that:

an agency's determination that a change in a project for which an EIS has been previously prepared is not a "significant" change requiring the preparation of a new or amended EIS (or supplement) . . . is very similar to an agency's threshold determination that a particular project does not "significantly affect( ) the quality of the human environment" such as would require the preparation of an original EIS. *Monarch Chemical, id.*

In this circuit, the standard of review for a decision that no EIS is required for a proposed action was originally set forth in *Wyoming Outdoor Coordinating Council v. Butz,* 484 F.2d 1244 (10th Cir. 1973). *Wyoming Outdoor* teaches that an agency's determination as to whether or not an EIS needed to be prepared for a particular action was not discretionary, but was a mandatory duty imposed by NEPA, thereby precluding judicial review of that determination under the "arbitrary, capricious, and abuse of discretion" standard of Section 706(2)(A) of the Administrative Procedure Act, 5 U.S.C. Section 706(2)(A). *Wyoming Outdoor,* 484 F.2d at 1248–49; *accord Jette v. Bergland,* 579 F.2d 59, 64 (10th Cir. 1978). The Court of Appeals went on to hold that the appropriate standard of review of an agency's decision not to prepare an EIS is:

whether the negative determination was reasonable in the light of the mandatory requirements and high standards set by (NEPA) so as to be "in accordance with law"–another ground of review in Section 706(2)(A) which may be applied consistently with the procedural demands of NEPA. 484 F.2d at 1249; *accord, Jette v. Bergland,* 579 F.2d at 64 (quoting from *Wyoming Outdoor*).

Therefore, in this case, the Assistant Secretary's FONSI will be reviewed to determine whether his finding that no "substantial changes" nor "significant new circumstances or information" accrued during the interim between the filing of the FESs and the date of the mining plan approval on January 11, 1980, was "reasonable . . . so as to be 'in accordance with the law.'"

■ Review of the Assistant Secretary's decision not to supplement under the dual standards of Part 1502.9(c)(1),[31] must be made keeping in mind NEPA's purpose of making agencies take a "hard look" at the environmental impacts of a proposed action. *See, Environmental Defense Fund,* 619 F.2d at 1378. Also, it must be remembered that when reviewing the reasonableness of a decision not to supplement the Court must not substitute its judgment for that of the Assistant Secretary. *Monarch Chemical,* 604 F.2d at 1090. A conclusion under either prong of the supplementation standard that the Assistant Secretary's determination was *not* "reasonable" is tantamount to a finding that the existing EIS record was *per se* inadequate for the 1978 Mining Plan Approval.

The supplementation criteria are necessarily utilized through a comparative analysis. Plaintiffs argue that the relevant comparison must be made between the 1975 Mining Plan (which was never given final approval by Defendants) and its revision, the 1978 Mining Plan. The Court, however, concludes that the appropriate comparison is between the mining plan as envisioned in the EIS record and as finally approved.[32] It would not further the purpose of NEPA to require the supplementation of an existing EIS merely because there have been "substantial changes" or "significant new circumstances or information" arising during the evolution of a project if they have already been adequately envisaged in the original EIS. There is no benefit in taking another "hard look" at an action if that view is taken from the same vantage point and overlooks the same environmental panorama. It does not matter how different

---

31. *See,* n.27, *supra.*

32. The Assistant Secretary's approval of the 1978 Mining Plan was conditioned upon compliance with 36 stipulations recommended by OSM. Intervenors' acceptance of that conditional approval incorporates those stipulations into the mining plan.

the 1978 Mining Plan is from the 1975 Mining Plan.

■ Therefore, the comparison under Part 1502.9(c)(1) must be between the EIS record and the 1978 Mining Plan as approved. The 1975 Mining Plan is, perhaps, of some marginal relevance, but only as a bench mark reference for this comparison.

*SUBSTANTIAL CHANGES.* Supplementation of an EIS is required under Part 1502.9(c)(1)(i) if "(t)he agency makes substantial changes in the proposed action that are relevant to environmental concerns...." This "substantial change" prong is consistent with the judicial conclusion that a new or supplemental EIS needs to be prepared only when there has been a " 'significant' change" in a project during the interval since the existing EIS record was prepared. *E. g., Environmental Defense Fund*, 619 F.2d at 1377; *Monarch Chemical*, 604 F.2d at 1087. As noted previously, the "substantial changes" must be ones for which there do not already exist formal EIS analysis and documentation.

Plaintiffs contend that there are "substantial changes" evident from the incorporated stipulations alone. Review of these reveals, however, that they are essentially concerned with increasing OSM's control over the project, especially reclamation. Examination of the EA shows that OSM determined that any environmental impacts associated with the stipulations had already been discussed in the FESs. EA at 2. Any differences between the mining plan as approved and as described in the EIS record do not rise, cumulatively, to the level of significance or "substantial(ity)" justifying

yet another environmental statement. The differences are, for the most part, matters of detailed site–specificity, *e. g.*, placement of facilities, roads, etc., and mandatory procedures to be followed for reclamation and revegetation. NEPA simply does not require that every facet of a proposed action be set forth in the EIS record in absolute detail. *Environmental Defense Fund*, 619 F.2d at 1376. In addition, Plaintiffs' desire for proliferous detail contravenes the intent of the revised regulations for conciseness and brevity in EISs. *See*, 40 C.F.R. Parts 1502.2(c) and 1502.7 (1979); 43 Fed.Reg. 55978–79 (1978).

Finally, Plaintiffs assert that the 1978 Mining Plan, as approved, is a "substantial change" solely because it addresses mining activity for only the northernmost quarter of the Leasehold. They contend, also, that the OSM stipulations [33] address activities in an area smaller than the northern sector of the lease.

Although the 1978 Mining Plan does not discuss mining activity for the entire leasehold as was done in the EIS record,[34] this fact alone is not sufficient to establish a "substantial change" requiring further supplementation of the EIS record. If the EIS record indicates proper consideration of the environmental consequences of mining in the northern sector of the project, then no supplementation is necessary *unless* Plaintiffs can show a "substantial change" between mining under the 1978 Mining Plan and mining as originally foreseen and discussed in the EIS record. *See, Environmental Defense Fund*, 619 F.2d at 1377.[35]

---

**33.** *See*, n.32, *supra*.

**34.** Approval of the Northern Mine alone was addressed as an alternative to the approval of a mining plan for the entire Leasehold. FES 77–13, para. 8.2.2.3 at p. 8–4. In addition, production and impact data for the Northern Mine was isolated in the EIS record. *See*, FES 77–13 at pp. 1–8, 1–9, 1–15, 1–19 through 1–21, 1–27, 2–15, 3–1 through 3–4, 3–15, 3–16, 3–30, 3–32 and 3–33.

**35.** In *Environmental Defense Fund*, the court stated:

if an EIS prepared for a whole program (such as the EIS record in this case which addresses the entire 40,286–acre project) contains a reasonable, good faith discussion of each of the five NEPA requirements applicable to future actions contemplated in order to implement the program (such as the 1978 Mining Plan in this case), ... no separate or supplemental EIS will be required for each future component action (such as the 1978 Mining Plan), unless a significant change occurs in the interval (between preparation of the FESs and the approval of the 1978 Mining Plan). 619 F.2d at 1377 (citations omit-

Plaintiffs have not made specific allegations as to "substantial changes" in the plan for the Northern Mine "that are relevant to environmental concerns."[36] Part 1502.-9(c)(1)(i). A comparison of the plan as finally approved and as originally considered shows the lack of any "substantial changes." For example, (1) the mine will be in the same location (the northernmost sector of the leasehold); (2) the same environment will be affected; (3) the same amount of acreage will be mined (6,831 acres); (4) the mining will take place over the same period of time (38 years); (5) the rate of production will be the same (increasing from 300 tons the first year to 6,400 tons per year from years five through thirty–eight); (6) the mining method will be the same (surface mining); (7) the reclamation method is basically the same; (8) the reclamation is being undertaken for the same end use (grazing); (9) the reclamation schedule will be approximately the same (compare EA at 73 with FES 77–13 at p. 1–15); and (10) the coal is being mined for the same purpose (commercial resale).

Plaintiffs do contend that the mining plan which was actually approved was only for a 935–acre segment of the Northern Mine, which will be mined over the first seven years of this project. It is upon this sector that OSM focused its stipulations which require the establishment of a trend towards successful reclamation in this sector before mining can go forward on the remainder of the Northern Mine. The Assistant Secretary's approval of the mining on the remaining portion of the Northern Mine was conditioned upon compliance with the stipulations within the targeted 935–acre segment. Rather than a change in the mining plan, these stipulations impose an overlay of continuing control on mining ac-

tivities previously contemplated. These enhance fulfillment of NEPA's purposes. *See, Environmental Defense Fund,* 619 F.2d at 1382; *Manygoats v. Kleppe,* 558 F.2d 556, 560–61 (10th Cir. 1977); *Sierra Club v. Hathaway,* 579 F.2d 1162, 1167 (9th Cir. 1978).

Therefore, under the standard of "reasonableness", this Court concludes that the Assistant Secretary's finding, based upon OSM's evaluation, that there were no "substantial changes" between the project as analyzed in the FESs and as finally approved in the 1978 Mining Plan, was "reasonable ... so as to be 'in accordance with the law' ", even under the "high standard" of NEPA. *Jette v. Bergland,* 579 F.2d at 64; *Wyoming Outdoor,* 484 F.2d at 1249.

*SIGNIFICANT NEW CIRCUMSTANCES OR INFORMATION.* The second prong of the mandatory supplementation standard, Part 1502.9(c)(1)(ii), requires supplementation of an EIS when "(t)here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."[37] Application of this subpart is much more troublesome to the Court than its counterpart. Any project, although it may undergo no "change" during its evolution, will, undoubtedly, generate "information" as it progresses. This new regulatory provision must be considered contemporaneously with NEPA's mandate as enforced through the EIS record. This means that in order for "new circumstances or information" to attain the status of "significant" these must reach that level where, reasonably, it becomes necessary to focus attention once more upon the environmental aspects of a project. *See, Warm Springs*

---

ted) (parenthetical comments added); *accord, Monarch Chemical,* 604 F.2d at 1087.

**36.** Plaintiffs have claimed that there are "changes" between the two descriptions of the mining plan because different agencies were responsible for examining the two plans and because different laws and regulations were in effect when the 1978 Mining Plan was formulated. However, Plaintiffs have not shown how these differences are "relevant to environmen-

tal concerns," much less why they would constitute "*substantial* changes."

**37.** Prior to the revised regulations, courts have interpreted NEPA as requiring federal agencies to gather and evaluate new information during the life of a project to determine whether supplementation of the existing EIS record should be made. *E. g. Warm Springs Dam,* 621 F.2d at 1023.

*Dam,* 621 F.2d at 1024. That is, a "hard look" must again be taken in the light of the "new circumstances or information." An otherwise unguarded reading of this subpart could unleash a procedural plague repeatedly impairing worthwhile projects even though there might be environmental data sufficient for the "hard look."

An integral component of this project is reclamation and revegetation which will closely follow the actual mining in time and distance. Plaintiffs claim that since the time FES 77–03 and FES 77–13 were prepared, there has been "significant new . . . information" which has come forth regarding the potential for successful reclamation in the arid southwest. This assertion is based upon data gathered over the past 3 to 4 years from experimental reclamation plots at the Utah International Mine, a project mentioned in the FESs which is very near the ConPaso Project. At Utah International, there have been ongoing efforts to reclaim land which is almost identical in composition to that at the Burnham location. However, Plaintiffs' allegation of "significant new . . . information" is not supported by the evidence.

Plaintiffs' expert, Dr. Robert R. Curry, testified that in his opinion there was not enough information available in 1976 and 1977 to substantiate the conclusion in the EIS record that reclamation at the Utah International project was being successfully established. He further stated that upon a return visit to the Utah project, subsequent to the 1978 Mining Plan approval, he again observed the experimental plots and concluded that there was not enough data from which one could conclude that reclamation was being successfully established. Not only did Dr. Curry think that reclamation had not been successfully established at the Utah project in 1976 and 1977, this also was his conclusion upon his reobservation of that project in February 1980. He stated that, from the time artificial irrigation is terminated, it would take a period of time of not less than 22 years before judgments could be made concerning the success of revegetation in this area.

Dr. Curry's testimony does not establish that there has been "significant new . . . information" arising during the interim between the FESs and the mining plan approval. The mere accumulation of data over a period of time, although of value, is not necessarily significant. Unless there is a marked deviation from the previous record, the significance of each year's activity is measured relative to the cumulative record then existing. It is the agency which has been endowed with expertise to determine whether the increased information available during a given interval is "significant." *Cf., State of Alaska v. Andrus,* 188 U.S.App.D.C. 202, 580 F.2d 465, 475 (D.C. Cir.1978), *vacated in part on other grounds sub nom. Western Oil & Gas Assn. v. Alaska,* 439 U.S. 922, 99 S.Ct. 303, 58 L.Ed.2d 315 (1978).

In this case OSM, the federal expert on mining reclamation, concluded that the cumulative reclamation data obtained since the FESs were filed in 1977 were not "significant." *See,* EA at 2. If data collected during this period indicated that reclamation would not be successful, that could be significant. However, Plaintiffs did not present that kind of testimony. All that Plaintiffs were able to establish through Dr. Curry was that as of the date of the 1978 Mining Plan approval the information received from the Utah International Mine was as inconclusive in early 1980 as it had been in 1976–77.

The Court concludes that the finding by the Assistant Secretary that there were no "new circumstances or information" relative to reclamation which warranted supplementation of the EISs was "reasonable . . . so as to be in accordance with the law." *Jette v. Bergland,* 579 F.2d at 64; *Wyoming Outdoor,* 484 F.2d 1249; *see, Warm Springs Dam,* 621 F.2d 1024. This conclusion is buttressed by the continuing reclamation controls imposed by the stipulations. *See, Environmental Defense Fund,* 619 F.2d at 1382; *Manygoats,* 558 F.2d at 560–61; *Sierra Club v. Hathaway,* 579 F.2d at 1168.

A second area of "new . . . information" alleged by Plaintiffs pertains to archeologi-

cal and paleontological resources. Plaintiffs contend that surveys which have been conducted during the relevant interval had established "new . . . information" on this project.

Prior to the preparation of the FESs, there was only one archeological survey conducted on the leasehold. This survey was a cursory, vehicular inspection conducted by the Museum of New Mexico in mid–1973 during which the surveyor travelled about 150 linear miles within the boundaries of the Northern Mine. This survey was acknowledged as "preliminary" by the surveyor. During this survey 15 sites were found. None was considered "major" by the surveyor. However, the report states that "(o)ther unrecorded sites might be found if a more intensive survey were undertaken." Peckham Report at 4. The EIS record also incorporated findings by the University of New Mexico on lands immediately north of the ConPaso Project where a site density of "approximately 10 sites per square mile" was established. The FESs also listed the proposed surveys that would be required before mining activity could commence on the project.

Subsequent to the filing of the FESs, additional archeological surveys were performed that validated the site density of "approximately 10 sites per square mile" in the Northern Mine area.[38] It is true that the findings of these latter surveys would negate some of the opinions expressed in the FESs, but it cannot be said that the invalidation of those comments renders this new information "significant", especially when the countervailing opinions are expressed in the statements. These surveys only substantiated the basic conclusion drawn in the FESs that there would be "approximately 10 sites per square mile" in the Northern Mine region. These surveys did establish site–specificity in this area. However, in this case, this specificity is neither inconsistent with the basic conclusions drawn in the FESs nor in conflict with the factual premises underlying those conclusions.

As to the paleontological claims, no paleontological surveys were conducted on the leasehold until after the filing of the FESs. However, the conclusions drawn in the EIS record were, again, substantiated by the subsequent surveys.[39] Again, of course, site–specificity was established. Based upon the fundamental agreement between data and opinions expressed in the EIS record and subsequent findings, and based upon the ongoing controls over this project (including not only the requirement of surveying prior to mining but also compliance with archeological and paleontological law), the Court concludes that the Assistant Secretary's finding that there were no "significant new circumstances or information" relative to archeological and paleontological resources was "reasonable" under *Jette v. Bergland* and *Wyoming Outdoor.*

Plaintiffs' claim that the Assistant Secretary violated NEPA and its regulations, specifically Part 1502.9(c)(1), by approving the 1978 Mining Plan without a supplement, fails.

**38.** An archeological survey was conducted in the Northern Mine sector from October 1977 to May 1978 yielding 154 sites in a 16–square mile area for a site density of approximately 9.6. A survey of the middle portion of the leasehold (also known as the "West Area") taken during December 1978 to March 1979 located 258 sites in a 23.9–square mile area for a site density of approximately 10.7. No archeological survey has been made in the southernmost portion of the leasehold which comprises roughly 15,000 acres ("South Area"). Assuming the South Area is as archeological fertile as the North and West Areas, this would mean that there are approximately 660 total archeological sites on the leasehold.

**39.** A paleontological survey of the Northern Mine area was conducted in mid–1977 which identified 82 sites, one of which contained the skull of a rare Pentaceratops. Although no explicit designations were made in the report as to which of these sites would be considered significant, recommendations were made with respect to the recovery of data at 36 of the sites. A survey of the West Area was made in 1978–79 which found 31 sites, only one of which was listed in the report as being significant. No paleontological survey has been conducted in the South Area.

■ *ADEQUACY OF THE EIS REC-ORD.* Although the Court has concluded that supplementation of the EIS record was not required prior to the approval of the 1978 Mining Plan, this does not resolve the issue as to the adequacy of the EIS record for that approval or for the approval of the 1976 Lease. The Court must now examine FES 77–03 and FES 77–13 to determine whether they contain sufficient environmental documentation and discussion as required by Section 102(2)(C) of NEPA to have allowed the Secretary and the Assistant Secretary to have taken a "hard look" at the environmental consequences associated with the 1976 Lease and the 1978 Mining Plan prior to their approvals. Indeed, "once an agency has made a decision subject to NEPA's procedural requirements, the *only* role for a court is to insure that the agency has considered the environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.' *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21, 96 S.Ct. 2718, 2730 n.21, 49 L.Ed.2d 576 (1976)." *Strycker's Bay*, 444 U.S. at 228–229, 100 S.Ct. at 500 (emphasis added); *accord, Environmental Defense Fund*, 619 F.2d at 1378.

■ This "hard look" adequacy of an EIS record is reviewed by the courts in this circuit under a "rule of reason." This standard was originally adopted by the Tenth Circuit in *National Helium*, 486 F.2d at 1002–03, and has been consistently applied by the Court of Appeals in this circuit from that time to the present.[40] Under the "rule of reason" judicial review of an EIS record is limited to the following three–part analysis:

1) whether (the EIS record discusses all of the five procedural requirements of (Section 102(2)(C) of) NEPA;

2) whether (the EIS record) constitutes an objective good faith compliance with the demands of NEPA; and

3) whether (the EIS record) contains a reasonable discussion of the subject matter involved in the five required areas. *Id.*

This "rule of reason" precludes the Court from reviewing FES 77–03 and FES 77–13 on their merits to determine sufficiency. *Manygoats*, 558 F.2d at 559. Defendants assert that in this circuit when a court is confronting the issue of the EIS record's adequacy the court is precluded from considering any evidence which is outside of the administrative record. This position is based upon dicta in *National Helium*, where the Court of Appeals did state that "(t)he hearing in the district court (to determine the adequacy of an EIS) consisted of a judicial review of the administrative record. It was not a trial *de novo*." 486 F.2d at 998. Defendants contend that the administrative record in this case consists solely of the EIS record itself and that the Court is confined exclusively to a review of that record. This Court does not agree.

■ The "rule of reason" requires that "an EIS (be) tested by the concepts of 'good faith' and a 'reasonable' discussion of the five mandated areas of subject matter (in Section 102(2)(C))." *Save Our Invaluable Soil*, 542 F.2d at 543; *accord, Environmental Defense Fund*, 619 F.2d at 1376 (quoting from *Save Our Invaluable Soil*). It is the opinion of this Court that when an EIS record is to be reviewed for adequacy, extra–administrative evidence may be received for the limited purpose of determining whether there has been a "good faith" and "reasonable" discussion of those five Section 102(2)(C) areas. *See, County of Suffolk v. Secretary of Interior*, 562 F.2d 1368, 1384–85 & n.10 (2d Cir. 1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978). Such extra–administrative evidence may be necessary in NEPA cases because:

1) it is the administrative record itself—the EIS and its supporting documents—

---

**40.** *Environmental Defense*, 619 F.2d at 1376; *Manygoats*, 558 F.2d at 559–60; *Save Our Invaluable Land (SOIL), Inc. v. Needham*, 542 F.2d 539, 542 (10th Cir. 1976), *cert. denied*, 430 U.S. 945, 97 S.Ct. 1580, 51 L.Ed.2d 792 (1977); *Sierra Club v. Stamm*, 507 F.2d 788, 793 (10th Cir. 1974).

which is the target of a court's scrutiny under the "rule of reason," *County of Suffolk*, 562 F.2d at 1384; and

2) a court is applying a more stringent standard than it would be applying with the "arbitrary, capricious, and abuse of discretion" standard.[41] *Save Our Ten Acres v. Kreger*, 472 F.2d 463, 465–66 (5th Cir. 1973); *Hiatt Grain & Feed, Inc. v. Bergland*, 446 F.Supp. 457, 491 (D.Kan.1978), *aff'd on other grounds* 602 F.2d 929 (10th Cir. 1979), *cert. denied*, 444 U.S. 1073, 100 S.Ct. 1019, 62 L.Ed.2d 755 (1980). Thus, information outside the administrative record may be necessary in order for a court to fully discharge its duty under the "rule of reason." *See, County of Suffolk*, 562 F.2d at 1384–85; *Atchison, T. & S. F. Ry. Co. v. Callaway*, 459 F.Supp. 188, 193 (D.D.C.1978).

Although the Tenth Circuit has never formally abandoned the dicta in *National Helium*, district courts in this circuit have allowed extra–administrative evidence to be introduced at NEPA hearings. *Hiatt Grain & Feed*, 446 F.Supp. at 492; *see, Sierra Club v. Stamm*, 507 F.2d at 789 (six–day evidentiary hearing held in the district court). *Contra, Central Okl. Preservation A. v. Okl. City, etc.*, 471 F.Supp. 68, 72–73 (W.D.Okla.1979). Such an examination of material outside of the administrative record for the very limited purpose of ascertaining whether the administrative record itself represents a "good faith" and "reasonable" effort to discuss the pertinent environmental impacts of a proposed action does not constitute holding a "trial *de novo*."

The evidence outside the administrative record which the Court allowed to be presented was addressed to the breadth of opinions held by members within a particular scientific community, *e. g.*, reclamation, and whether an opinion expressed in the EIS record was based upon a school of thought that was widely acknowledged by members of that scientific community. *County of Suffolk*, 562 F.2d at 1385. The Court also received evidence focused on the scientific methodology supporting statements made in the EIS record to determine the general acknowledgment of that methodology within its associate substantive community. *See, Id.* To the extent that these considerations required that the Court glance at the merits, the Court found it necessary to do so in order to make its determination as to "good faith" and "reasonableness." *But see, Manygoats*, 558 F.2d at 559.

When sufficient evidence had been received to enable the Court to consider the doctrinal and methodological bases for opinions made in the FESs relative to their "good faith" and "reasonableness," no further intrusion into the merits was permitted. For example, a comparative analysis of the merits of one school of thought or methodology over another is beyond the scope of judicial review. *See, id.* at 560. However, without the right to superficially scan the merits for a limited purpose, the Court could easily be relegated to perfunctorily pronouncing an EIS as adequate solely because of the appearance of its format rather than upon a determination as to the "good faith" of its "compliance with the demands of NEPA" and the "reasonableness" of its "discussion of the five required areas." This would be in derogation of the "rule of reason."[42]

Plaintiffs contend that the EIS record in this case is too deficient to satisfy the de-

**41.** Under the "arbitrary, capricious, and abuse of discretion" standard, a court is restricted to a review based solely upon the administrative record. *E. g., Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973).

**42.** To illustrate: Plaintiffs raised serious questions as to the acceptability within the reclamation community of opinions and methods relied upon for conclusions made in the FESs. *See, County of Suffolk*, 562 F.2d at 1384–85. The Court found it necessary, especially because of the lack of solidarity within that community, to determine whether all of the viewpoints which would be widely acknowledged within that community were expressed in the EIS record, and whether the methodology utilized in the FESs was widely acknowledged within the community. A negative finding on either inquiry would certainly cut against the reasonableness of the EIS record, and could show the lack of *objective* good faith compliance as well.

mands of Section 102(2)(C). Plaintiffs challenge the sufficiency of the FESs in four areas, claiming that they contain inadequate discussion of land reclamation, alternatives to the proposed action, paleontological and archeological resources, and impacts of the human environment. Plaintiffs do not contest the discussions of these areas relative to the first prong of the "rule of reason" since it is obvious from a brief inspection of the FESs that "(the EIS record) discusses all of the five procedural requirements of (Section 102(2)(C))." Plaintiffs do, however, allege that the discussions of these four areas fail to satisfy both the "objective good faith" and the "reasonable" prongs of the "rule of reason" standard.

The type of environmental statement required for a proposed action which is subject to NEPA, and the extent of environmental discussion within that statement which is necessary to fulfill the requirements of Section 102(2)(C) is dependent partly upon the kind of action which is involved, *Aberdeen & Rockfish R. Co. v. S. C. R. A. P.*, 422 U.S. 289, 322, 95 S.Ct. 2336, 2357, 45 L.Ed.2d 191 (1975); *Manygoats*, 558 F.2d at 560, and partly upon the circumstances surrounding that action, especially where continuing agency control over the project is involved. *Environmental Defense Fund*, 619 F.2d at 1382; *Manygoats*, 558 F.2d at 560–61; *Sierra Club v. Hathaway*, 579 F.2d at 1167–68; *County of Suffolk*, 562 F.2d at 1378–82; *Sierra Club v. Morton*, 510 F.2d 813, 827–28 (5th Cir. 1975). There are two distinct kinds of "major Federal action" involved in this case–the 1976 Lease approval and the 1978 Mining Plan approval.[43] Because each of these actions has its own unique surrounding circumstances, a determination as to whether the

discussions contained in the FESs constitute "good faith" and "reasonable" discussions of the four areas targeted by Plaintiffs requires that the EIS record be tested for adequacy with respect to each of these actions.

*RECLAMATION AND REVEGETATION.* Plaintiffs first challenge the adequacy of the discussion of reclamation and revegetation in the FESs. Specifically, Plaintiffs contend (1) that there is a void of discussion as to the prevalent "state of the art" as to reclamation and revegetation; (2) that various essential elements of reclamation were omitted from the statements, *e. g.*, geology, soil and plant ecology, biogeography, and climatic history; (3) that there was insufficient observation of experimental reclamation plots on comparable lands; and (4) that the FESs fail to accurately depict the potential for failure of reclamation and revegetation.

As for the "state of the art" contention, there simply is no requirement in Section 102(2)(C), or elsewhere in NEPA, that the "state of the art" of a scientific discipline be explicitly discussed in an EIS, especially as an autonomous category. *See*, 42 U.S.C. Section 4332(2)(C). It is implicit in the reclamation discussion in the FESs that there is a divergence of opinion as to what the "state of the art" of reclamation may be.

It suffices that the diversity of thought within the reclamation community was reflected in the FESs and that the prevalent opinions, however contradictory one with another, were expressed. The "state of the art" of reclamation is far from settled. To the extent that it is ascertainable, it has been interwoven into the fabric of the EIS record through the opinions expressed regarding the potential for either success or

**43.** Defendants and Intervenors have not challenged Plaintiffs' assertion that both the 1976 Lease approval on August 31, 1977, and the 1978 Mining Plan approval on January 11, 1980, constitute "major Federal actions significantly affecting the quality of the human environment ..." as defined in Section 102(2)(C) thereby requiring the preparation of an EIS. *See*, 42 U.S.C. Section 4332(2)(C). Indeed, the courts have uniformly held that the Secretary's required approval of a mining lease on Indian lands constitutes "major Federal action" subject to Section 102(2)(C). *Manygoats*, 558 F.2d at 557; *Davis v. Morton*, 469 F.2d 593, 597–98 (10th Cir. 1972); *Cady v. Morton*, 527 F.2d 786, 793 (9th Cir. 1975). Final federal approval of a mining plan which actuates the terms of a mining lease on Indian lands is likewise considered to be "major Federal action." *Cady v. Morton, id.*

failure of reclamation and revegetation within this project. Further discussion of the "state of the art" is not required by NEPA.

Plaintiffs' second reclamation allegation—that vital elements of reclamation were omitted from consideration in the statements—met its demise during the presentation of Plaintiffs' own case. Plaintiffs' reclamation expert, Dr. Robert R. Curry, candidly admitted that there is an inability within the reclamation discipline to agree on a basic definition of reclamation or, indeed, its elements. Under the "rule of reason," a "controversy of experts" is beyond the scope of judicial review. *See, Manygoats,* 558 F.2d at 560; *County of Suffolk,* 562 F.2d at 1383. A "controversy of experts" must remain free from judicial intervention where, as here, the experts within a particular scientific field are engaged in internal conflict to establish the parameters of their expertise. Therefore, Plaintiffs' second reclamation contention necessarily fails.

Plaintiffs' third contention is that at the time the FESs were compiled there were insufficient empirical studies of reclamation to substantiate conclusions stated in the EIS record that reclamation could be successfully accomplished on the ConPaso Project. This is an attempt to have the Court review the EIS record on the merits. This is prohibited by *Manygoats.* 558 F.2d at 559. The extent of field observation which must be done before conclusions regarding the potential for successful reclamation can be drawn is within the realm of expertise of the reclamation community. Plaintiffs' expert, Dr. Curry, testified that it would take approximately 22 years (the equivalent to one–half of a major drought cycle), once artificial irrigation had terminated on a test plot, before there could be definitive evidence that a reclamation program could be successful in arid southwest regions such as at the Project. Intervenors' reclamation expert, Dr. Earl F. Alden, stated that there was more than enough recla-

mation data available in 1977, prior to the finalization of the FESs, from which one could have concluded that the chances for successful reclamation at the ConPaso Project were good. Obviously, this is another arena of reclamation controversy that is off limits to the Court.

The fourth basis for Plaintiffs' attack on the sufficiency of the reclamation discussion is that the EIS record does not accurately depict the potential for unsuccessful reclamation of the leasehold. It is true that the EIS record does contain favorable comments concerning the potential for successful reclamation that might someday prove to have been overly optimistic. *E.g.,* FES 77–03, Vol. I at p. 1–50; FES 77–13 at p. 6–1. However, it is also true that countervailing comments are recorded in the FES which suggests the unlikelihood of successful reclamation on the project, *e.g.,* FES 77–03, Vol. I at pp. 3–31, 3–32, 3–34 and 7–1; Vol. II at pp. 10–53, 10–187, 10–289;[44] FES 77–13 at p. 3–11. The EIS record reflects contradictions inherent within the reclamation scientific community. These stem from disagreement as to the confines, methods and goals of reclamation.

There has been no showing that the discussions contained in the EIS record concerning reclamation were not made in "good faith" or were not "reasonable." The Court concludes that reclamation discussions in the FESs were more than adequate to appraise the decisionmakers of the environmental consequences flowing from either successful or unsuccessful reclamation on the ConPaso Project. Those discussions enabled the Secretary and the Assistant Secretary to take the requisite "hard look" at those consequences.

The reclamation discussion must also be addressed in light of the ongoing controls which are involved in the 1976 Lease and the 1978 Mining Plan. *See, Environmental Defense Fund,* 619 F.2d at 1377, 1382; *Manygoats,* 558 F.2d at 560–61. The 1976 Lease contains provisions which enable the Tribe to monitor and control reclamation on

---

44. The comments made on the draft versions of an EIS "are to be regarded as an integral part of the (FES)." *National Helium,* 486 F.2d at 1003 (citations omitted).

the leasehold. Also, USGS had the responsibility at the time the lease was approved to supervise compliance with federal regulations on the leasehold. Finally, before any mining could be undertaken there would have to be a mining plan prepared which was approved by the Tribe, the State of New Mexico, and federal officials. The continuing control that OSM exerts over the 1978 Mining Plan via the stipulations has been previously discussed. In addition, several other federal agencies will maintain continuing control over the ConPaso Project.[45]

Based upon the reclamation discussion in the EIS record and based upon the continuing controls in effect with respect to the 1976 Lease and the 1978 Mining Plan, the Court concludes, in accordance with the "rule of reason," that the EIS record was more than adequate to have enabled the Secretary and Assistant Secretary to take a "hard look" at the environmental consequences of the 1976 Lease and the 1978 Mining Plan relative to reclamation.

*ALTERNATIVES.* The second alleged insufficiency in the EIS record is the failure to adequately provide a detailed list of alternatives to the proposed action. Plaintiffs complain that the EIS record fails to adequately discuss the alternatives of (1) utilizing mining methods other than surface mining; (2) delaying the approval of the project until more reclamation data are accumulated and analyzed, and (3) approving the 1978 Mining Plan with the stipulations.

■ Discussion of alternatives in an EIS is mandated by Section 102(2)(C)(iii). 42 U.S.C. Section 4332(2)(C)(iii). The adequacy of the discussion of alternatives in an EIS is of particular importance because this discussion "is the heart of the (EIS)." 40

C.F.R. Part 1502.14 (1979). In this circuit, "(t)he discussion of environmental effects of all alternatives need not be exhaustive, but it must be such that sufficient information is contained (in the EIS record) to permit a 'rule of reason' designation of alternatives beyond the primary proposal." *Environmental Defense Fund,* 619 F.2d at 1375; *accord, State of Alaska v. Andrus,* 580 F.2d at 475; *Monroe County Conservation Council v. Adams,* 566 F.2d 419, 425 (2d Cir. 1977), *cert. denied,* 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978).

In this case, the EIS record contains 86 pages of discussion of alternatives.[46] It is unnecessary to list the many variant alternatives considered in the record, except as they relate to the three alternatives Plaintiffs are contending have been inadequately discussed. With respect to other mining methods, the EIS record contains discussion of several alternatives to the type of surface mining to be employed in this project. These alternatives include underground mining, use of scrapers and dozers, bucket-wheel excavation, and use of power shovels with trucks. FES 77–03, Vol. I, para. 8.2.5.-2a at pp. 8–45 through 8–48; FES 77–13, para. 8.2.2.2 at pp. 8–3 through 8–4. Plaintiffs have made only conclusory assertions of inadequacy of this discussion without attempting to substantiate their position. The EIS record reflects sufficient information to permit a "rule of reason" designation of mining methods beyond surface mining.[47]

Plaintiffs next contend that the discussion of alternatives is inadequate because there was no discussion of the alternative of delaying the approval of the mining plan until additional reclamation experimentation is conducted on nearby locations such as the Utah International Mine. There is

---

**45.** Other federal agencies which will have continuing controls over this project include BIA, USGS, EPA, Mine Safety & Health Administration, Advisory Council on Historic Preservation and Public Health Service. Intervenors' Preliminary Injunction, Exhibit No. 39.

**46.** See FES 77–03, Vol. I, Chap. VIII at pp. 8–1 through 8–80; FES 77–13, Chap. VIII, pp. 8–1 through 8–6.

**47.** For example, the comparative discussion of underground mining established with numerical specificity the higher production costs, greater fatality rates and lower percentage yield for underground mining versus the proposed surface mining methodology. FES 77–03, Vol. I, at pp. 8–45 through 8–47; FES 77–13 at pp. 8–3 through 8–4.

no statutory or regulatory provision which requires that a specific alternative of delay be discussed in an EIS. *See,* 42 U.S.C. Section 4332(2)(C)(iii); 40 C.F.R. Part 1502.-14 (1979). However, there are instances when a delay alternative must be discussed. *E.g., Alaska v. Andrus,* 580 F.2d at 474. The kind of alternatives which must be discussed in an EIS record and the extent of that discussion is dependent upon the kind of action involved. *See, Aberdeen & Rockfish,* 422 U.S. at 322, 95 S.Ct. at 2357; *Manygoats,* 558 F.2d at 560.

■ Plaintiffs have based their second attack on the discussion of alternatives upon the fact that at present there exists uncertainty regarding the potential for successful reclamation on this project. However, "agencies may not be precluded from proceeding with particular projects merely because the environmental effects of (those projects) remain(s) to some extent speculative." *Alaska v. Andrus,* 580 F.2d at 473. "(I)ndeed, 'one of the functions of (an EIS) is to indicate the extent to which environmental effects are essentially unknown.'" *Id.* at n.36 (quoting *Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Com'n,* 156 U.S.App.D.C. 395, 408, 481 F.2d 1079, 1092 (D.C.Cir.1973)). It is the agency's responsibility to make an *informed* prediction as to the potential environmental effects of a proposed action and alternatives to that action. *Id.* at 473. However, NEPA does not require that these predictions be predicated upon "crystal ball" inquiries. *E.g., Environmental Defense Fund,* 619 F.2d at 1375; *Alaska v. Andrus,* 580 F.2d at 473; *County of Suffolk,* 562 F.2d at 1378. It is the agency which must determine when it has gathered enough information to enable it to make its informed predictions and to proceed with the proposed action. *Alaska v. Andrus,* 580 F.2d at 473. Once the agency has made a determination that it has enough information to make its predictions and to proceed, "the courts may not substitute their judgment for that of the decisionmaker and insist that the project be delayed while more information is sought." *Id.* at 473–74; *see, Strycker's Bay,* 444 U.S. at 225–227, 100 S.Ct. at 499; *Kleppe v. Sierra Club,* 427 U.S. at 410 n.21, 96 S.Ct. at 2730 n.21.

In the present litigation, the EIS record accurately depicts the uncertainty of reclamation on the ConPaso Project. OSM, the federal reclamation expert, and the Assistant Secretary have determined that there was enough information available in the EIS record to approve the 1978 Mining Plan. This Court cannot substitute its judgment for theirs as to the quantum of information which was necessary for that approval. *Id.* OSM and the Assistant Secretary have also concluded that there was no need for discussion of a specific delay alternative in the EIS record prior to the 1978 Mining Plan approval. Again, this Court cannot substitute its judgment for the decisionmakers', but must review the omission of a delay alternative under the "rule of reason."

The decisionmakers rejected the need for discussion of a specific delay alternative on the following grounds. First, there was a recognition of the exigent need this country has to develop its internal energy resources, of which coal is a key component. *See,* EA at 32. Second, OSM determined that it would take a minimum 12 more years of study and analysis before there could be a definite possibility for conclusively predicting the potential for reclamation success on this project (Plaintiffs' expert testified that this would take a minimum of 22 years). *Id.* Third, OSM states that even if this extensive study was undertaken there was a possibility that it could yield the same inconclusive results that exist today. *Id.* at 33. Fourth, OSM and the Assistant Secretary concluded that the controls which OSM can exert over this project, including the right to terminate the project after seven years when only 935 acres have been disturbed, obviated the need for further information to be gathered prior to implementation. *See, County of Suffolk,* 562 F.2d at 1378. Finally, it was determined that dis-

cussion of the "no action"[48] or rejection alternative in the EIS record, FES 77–13, para. 8.2.1 at p. 8–2, was sufficient to inform the decisionmaker as to the environmental effects of delay to the extent that such a discussion was necessary. *See*, EA at 4.

The EIS record discusses the need for additional reclamation study to an extent which is more than sufficient to have allowed the Assistant Secretary to have made his determination as to whether the mining plan could be approved without further information or should be held in abeyance until further reclamation studies are completed. Based on this and on the rationale discussed above, the Court concludes that the omission of the delay alternative did not violate NEPA's mandate under the "rule of reason." *See, Sierra Club v. Froehlke*, 534 F.2d 1289, 1296 n.25 (8th Cir. 1976).

Plaintiffs' third allegation of inadequacy concerning the discussion of alternatives is not actually an attack upon the adequacy of the alternatives themselves. It is, instead, an assault on the adequacy of the discussion of the proposed action as finally approved– the 1978 Mining Plan with stipulations. Because agencies must make environmental comparisons between a proposed action and reasonable alternatives to that action, *e.g., Environmental Defense Fund*, 619 F.2d at 1375; *see*, 42 U.S.C. Section 4332(2)(C)(iii), it is axiomatic that the discussion in the EIS record of the proposal finally adopted must be adequate to satisfy the "rule of reason."

In this case, there is no discussion of the 1978 Mining Plan as approved under any specific heading such as "Approval of the 1978 Mining Plan with Stipulations." Such is not required. FES 77–13 discusses the possibility of approving only the Northern Mine initially. FES 77–13, para. 8.2.2.3 at p. 8–4. That volume is also replete with discussion of the environmental impacts attributable to the Northern Mine as a distinct entity.[49] The discussion in the EIS record addressing the Northern Mine is

more than sufficient to comply with the "rule of reason."

■ Plaintiffs contend that even if the EIS record was sufficient for approval of the 1978 Mining Plan *per se*, the lack of discussion of the stipulations renders the record necessarily deficient as a basis for approval of the mining plan *as modified by those stipulations*. This position is not supported by the law or the facts. An EIS record does not become inadequate merely because technological methods and procedures are modified during the course of a project when those modifications do not create significant changes in the expected environmental impacts, and when the original discussion of current technology is sufficient to satisfy the "rule of reason." *See Environmental Defense Fund*, 619 F.2d at 1380.

The stipulations imposed by OSM are primarily ongoing controls addressed to the reclamation phase of the project. The EIS record reflects the evolutionary nature of reclamation technology and discusses the probability of changes in the procedures to be utilized during the project's life. FES 77–03, Vol. I at pp. 8–49 through 8–50. The Court has already found that the changes stemming from the stipulations do not give rise to significant environmental concerns not previously discussed in the EIS record. The Court has also concluded that the discussion of reclamation technology in the EIS record is sufficient to fulfill the demands of the "rule of reason." Therefore, the omission of discrete discussion of the stipulations was not fatal. The Court concludes that the EIS record provided an adequate basis for approval of the 1978 Mining Plan with stipulations.

*ARCHEOLOGICAL AND PALEONTO-LOGICAL RESOURCES.* The third alleged deficiency in the EIS record is the failure to describe the nature, extent and importance of archeological and paleontological resources on the leasehold, and to properly survey those resources and take

---

**48.** *See*, 40 C.F.R. Part 1502.14(d) (1979).

**49.** *See*, n.34, *supra*.

mitigating measures prior to approval of the lease and mining plan.

The EIS record contains a detailed description of the nature and type of archeological and paleontological resources which could be expected to be encountered on the leasehold. *See*, FES 77–03, Vol. I at pp. 3–87 through 88; FES 77–13 at pp. 2–39 through 40. Secondly, although Plaintiffs stated in one of their briefs that "(n)o estimate is given of the number of archeological sites on the leasehold (in the EIS record)," this simply is not true. The density of archeological sites expected to be discovered was ten sites per square mile. This estimate was based upon an archeological survey that was conducted on land immediately north of the ConPaso Project. FES 77–03, Vol. I at p. 3–87; FES 77–13 at p. 3–44. Also, the EIS record estimates that the total number of archeological sites in the entire leasehold was between 600 and 650 sites. *Id.* The accuracy of these estimates has been verified by surveys conducted subsequent to the filing of the FESs.[50] The potential importance of these resources is also expressed in the statements. FES 77–03, Vol. I at pp. 2–184 through 2–185 and 3–187 through 3–188; FES 77–13 at pp. 2–39 through 2–40.

Plaintiffs have also contended that there should have been surveys conducted on the entire leasehold for archeological and paleontological resources and that all discovered resources should have been studied and evaluated in the FESs before approval of either the lease or the mining plan. There was only one preliminary archeological survey and no paleontological survey made prior to the filing of the FESs. However, statements made in the FESs relative to archeological and paleontological resources were based upon surveys and findings which occurred within the immediate vicinity of the ConPaso Project. These findings were deemed to be sufficient to allow a "reasonable" discussion of the impacts of the proposed actions upon those resources. In addition, the FESs specifically set forth ongoing controls over this phase of the project which include the conducting of surveys, inventorying, mitigating and clearance before any mining activities can commence on a particular sector of the project. FES 77–03, Vol. I at p. 3–88.

Based upon the data available, the discussions included in the FESs, and the ongoing controls over this segment of the project, the Court concludes that in relation to archeological and paleontological resources the EIS record was in "good faith compliance" and represents a "reasonable discussion" so as to provide the Secretary and the Assistant Secretary the means to take a "hard look" at the environmental consequences of approvals of the Lease and Mining Plan.

*HUMAN ENVIRONMENT.* The final allegation of inadequacy is based upon the discussion of the effects the proposed project will have upon the members of the Burnham community. Plaintiffs assert that the EIS record is deficient with respect to its discussion of mitigation measures, psychological harm attending relocation of Burnham residents during mining operations and the cumulative impacts of this project in conjunction with other energy projects in the area.

Plaintiffs have not made any arguments in support of these allegations either in their briefs or in open court. The only evidence which has been admitted regarding this claim is two affidavits from an anthropological doctoral candidate and deposition testimony of several Plaintiffs, one of whom also testified briefly at the hearing.

The EIS record contains over 200 pages devoted to the description and analysis of the human impacts associated with this project, not only by itself but also as a part of the aggregate energy development in the vicinity of Burnham. FES 77–03, Vol. I at pp. 2–85 through 2–181, 3–44 through 3–86, 3–117 through 3–134, 5–7, 5–8, 5–10 and 6–5; FES 77–13 at pp. 2–23 through 2–39, 3–13 through 3–45, 4–3 through 4–5, 6–1 and 7–1. These discussions include exten-

---

**50.** *See*, n.38, *supra.*

sive demographics and topical analyses in areas such as land use, water use, transportation, utilities, housing, education, health services and government services. In addition, there are discussions of the interrelationships within the Navajo Tribe and between Navajos and non–Navajos. The EIS record contains pervasive and detailed observations regarding the impacts of the proposed project upon each of these topics. Relocation is one such topic. Much of this discussion was directed by a professional anthropologist with over 30 years of experience in observing the Navajo people.

A review of the above citations to the EIS record quickly destroys any allegation of inadequacy in the discussion of human impacts and shows beyond doubt that the EIS record represents a "reasonable" and "good faith compliance with the demands of NEPA. . . ." *Environmental Defense Fund*, 619 F.2d at 1376.

Plaintiffs have failed to establish inadequacy in the EIS record pursuant to the "rule of reason." They are, accordingly, denied any relief under their First Cause of Action.

*NHPA AND EXECUTIVE ORDER 11593.* As their Second Cause of Action, Plaintiffs allege violations of the National Historic Preservation Act of 1966 (NHPA), 16 U.S.C. Section 470 *et seq.*, and Executive Order 11593. NHPA and Executive Order 11593 impose duties upon the federal agencies for the protection and preservation of significant historic and cultural data, including archeological objects. *See,* 16 U.S.C. Section 470; Exec.Order 11593, Section 1. These obligations are separate and independent from those mandated by NEPA. 36 C.F.R. Parts 800.2 (1977) and 800.9 (1979). Therefore, although the Court has concluded that the treatment of archeological and paleontological resources on this project was adequate for compliance with Section 102(2)(C) of NEPA, this conclusion

does not guarantee that there has been compliance with the directives of either NHPA or Executive Order 11593.

■ *NHPA.* The parties agree that compliance with NHPA is required, but disagree as to the proper timing for compliance. Plaintiffs argue that under provisions of Section 106 of NHPA, 16 U.S.C. Section 470f, as amended in 1976, all archeological sites existing on the entire 40,-286–acre leasehold should have been inventoried and evaluated for enrollment eligibility in the National Register of Historic Places (National Register) [51] prior to the Secretary's approval of the 1976 Lease on August 31, 1977. Defendants and Intervenors contend that compliance with Section 106 was not required until the 1978 Mining Plan was given final approval on January 11, 1980, and that NHPA is applicable at present only to the Northern Mine area. Defendants and Intervenors also insist that compliance with NHPA may be accomplished in phases as long as compliance for each particular phase is completed prior to any land–disturbing activity in that area.

Section 106 of NHPA provides:

The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally–assisted undertaking in any State and *the head of any Federal department or independent agency having authority to license any undertaking* shall, prior to the approval of the expenditure of any Federal funds on the undertaking or *prior to the issuance of any license* . . . take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation [52] . . . a reasonable opportunity to comment with regard to such un-

**51.** The National Register of Historic Places is a listing of "districts, sites, buildings, structures, and objects significant in American history, architecture, archeology, and culture . . ." which constitute the subject matter of NHPA's protection. 16 U.S.C. Section 470a.

**52.** The Advisory Council on Historic Preservation is the federal agency which was been charged with the responsibility of administering NHPA. 16 U.S.C. Section 470i.

dertaking. 16 U.S.C. Section 470f (emphasis added).

Section 106 places two duties upon Federal agencies when supervising a project which is subject to NHPA. First, the agency must take into account the potential effect of the proposed undertaking upon sites, etc., listed or eligible for listing in the National Register. Second, the agency must then give the Advisory Council a reasonable period within which to comment on the undertaking. The agency must perform these two duties *before* issuing any "license" effectuating the undertaking. In addition, when the Advisory Council does comment upon a particular undertaking the supervising agency must take those comments into account "prior to the issuance of any license." *See*, 36 C.F.R. Parts 60.2(c) and 60.12(a) (1977).

Plaintiffs' position that compliance with NHPA's provisions was required for the entire leasehold prior to the 1976 lease approval [53] is based upon an interpretation of Section 106 that allows for only a solitary cut–off date by which there must be total compliance with NHPA for the entire project. It is further based upon the premise that Section 106 mandates that the relevant cut–off date in this case is the date of the 1976 Lease approval, August 31, 1977. To support that proposition Plaintiffs rely upon the Advisory Council's regulations which provide that an " 'undertaking' means any Federal . . . approval . . . including . . . (n)ew and continuing projects . . . *involving a Federal lease*." 36 C.F.R. Part 800.3(c) (1977) (emphasis added); *accord*, 36 C.F.R. Part 800.2(c) (1979).

Plaintiffs' interpretation of Section 106 would have completion of the following steps prior to August 31, 1977. First, Inter-venors would have surveyed the leasehold for the purpose of identifying sites that would be potentially eligible for inclusion in the National Register. *See*, 36 C.F.R. Parts 800.4(a) (1977) and (1979). Second, the potential sites identified in the surveys would have been formally evaluated to determine their Register eligibility. *See*, 36 C.F.R. Parts 800.4(a)(2) (1977) and 800.4(a)(3) (1979). Third, all sites which had been determined eligible would have been further evaluated to determine the potential effect of the ConPaso Project upon those sites. *See*, 36 C.F.R. Parts 800.4(b) (1977) and (1979). Fourth, dependent upon the determination reached during the previous step as to each site, the appropriate documents would have been prepared and submitted to the proper agency for further study. *See*, 36 C.F.R. Parts 800.4(b), (c), (d) and (f) (1977) and 800.4(b), (c), (d) and 800.5 (1979). Fifth, for those sites with a determination of adverse effect, a memorandum of agreement would have been entered into between the Intervenors, the New Mexico State Historic Preservation Officer (SHPO), the Executive Director of the Advisory Council and the responsible federal agencies to set forth the plans for avoidance of or mitigation on these sites. 36 C.F.R. Parts 800.5(e) and (f) (1977) and 800.6(b)(5) (1979). Sixth, the memorandum of agreement would have been submitted to the Advisory Council for review and comment. 36 C.F.R. Parts 800.6 (1977) and 800.6(c) (1979).

In other words, approximately 660 archeological sites [54] would have had to have been evaluated, submitted, and, if enrolled in the Register, properly planned for avoidance or mitigation. All of this would have been accomplished only through substantial expenditures of more time and more money

---

**53.** Plaintiffs have also suggested that Section 106 requires a dual compliance in this case: first, prior to the lease approval and, second, prior to the mining plan approval. Obviously, if there had been valid compliance with NHPA for the entire leasehold when the lease was approved this would have obviated the necessity for any subsequent compliance until the commencement of the mining operations.

Once mining begins, should any "National Register or eligible" sites be discovered, the regulations provide for the protection and preservation of those sites through the Historic and Archeological Data Preservation Act of 1974 (HADPA), 16 U.S.C. Section 469 *et seq.* 36 C.F.R. Part 800.7(a) (1979).

**54.** *See*, n.38, *supra*.

by Intervenors.[55] All of this would have to have been accomplished without any assurance that there would ever be a valid lease. All of this would have been accomplished when there were yet many procedural impediments that needed to be removed before there was any potential threat to any historically or culturally significant object on the leasehold. This would be unreasonable and wasteful.

Plaintiffs' view of Section 106 does not comport with the language of that section, especially as interpreted by the Advisory Council's regulations, 36 C.F.R. Part 800, and as applied by the Council in the context of this case.[56] One of the premises upon which Plaintiffs must rely to sustain their position that total compliance was required prior to August 31, 1977, is that approval of the 1976 Lease was the issuance of the "license" which triggered NHPA's compliance deadline. An examination of the relevant provisions in conjunction with the facts of this case persuades the Court that such characterization of the lease approval is incorrect.

As relates to this case, to come within the ambit of Section 106 it is necessary that a "proposed . . . undertaking" be one over which a Federal department has authority to "license." 16 U.S.C. Section 470f. The regulations define "(u)ndertaking" in a broad sense. They include "(n)ew and continuing projects . . . involving a Federal lease, permit, license. . . ." 36 C.F.R. Part 800.3(c)(2) (1977); *accord*, Part 800.2(c)(2) (1979). The Court concludes that the Advisory Council intended "undertaking" to include a mining project entered into pursuant to a federally–approved lease. *See*, 36 C.F.R. Parts 800.3(c) (1977) and 800.2(c) (1979).

However, simply because the ConPaso Project involves a federally–approved lease it does not necessarily follow that the approval of that lease constitutes the "issuance of any license" as intimated by

Plaintiffs' position. The ConPaso Project is a coal mining project. The "license" which actuates that mining is the Assistant Secretary's approval of the 1978 Mining Plan. The approval of the lease was required only because tribal lands were involved. *See*, 25 U.S.C. Section 396a. The "license" which required prior compliance with Section 106 and NHPA is the 1978 Mining Plan approval.

The second postulate for Plaintiffs' position that Section 106 mandates compliance *in toto* prior to the "issuance of any license" is based upon a stilted reading of Section 106 that is not adhered to by the Advisory Council. 36 C.F.R. Part 800.6(1) (1977), entitled "Continuing review jurisdiction," provides:

When the Council has commented upon an undertaking pursuant to Part 800.6 such as a comprehensive or area–wide plan that by its nature requires subsequent action by the Federal Agency, the Council will consider its comments or approval to extend only to the undertaking as reviewed. The Agency Official shall ensure that subsequent action related to the undertaking is submitted to the Council for review in accordance with Part 800.4(e) of these procedures when that action is found to have an adverse effect on a property included or eligible for inclusion in the Federal Register.

Inherent in the above provision is the recognition that some projects may require ongoing compliance with NHPA. To facilitate compliance in those cases the Council has interpreted Section 106 as allowing for stage–by–stage compliance. In *WATCH (Waterbury Action, etc.) v. Harris*, 603 F.2d 310, 326 (2d Cir. 1979), *cert. denied*, 444 U.S. 995, 100 S.Ct. 530, 62 L.Ed.2d 426 (1980), the Second Circuit followed a parallel rationale and concluded that NHPA requires ongoing compliance and does not establish a singular cut–off date for compliance. However, the

---

**55.** As of the time of the hearing on the preliminary injunction, Intervenors had invested over 30 million dollars in this project over a 20–year period. Yet, they had not as yet been able to produce one lump of coal for commercial sale.

**56.** The Advisory Council has been authorized to promulgate regulations to implement NHPA. 16 U.S.C. Section 470s.

*WATCH* opinion did not consider the issue as to whether step–by–step compliance procedure is valid when there is the potential for total compliance.

In this case, a Memorandum of Agreement was executed among Intervenors, the Advisory Council, the New Mexico SHPO, and USGS on October 27, 1978.[57] This agreement allows Intervenors to comply with NHPA in phases. Under the terms of the Memorandum of Agreement, USGS requires that archeological clearances be granted by the National Park Service prior to the initiation of mining activities on the leasehold. To date, there has been only one such clearance granted. This clearance opened a 720–acre tract in the Northern Mine area which will circumscribe the extent of mining activity during the first 7 years of operation. Prior to archeological clearance this sector was resurveyed. Eight archeological sites were identified in this area. These were all evaluated and nominated for enrollment in the National Register.[58] An evaluation was then made to determine the impact of the mining upon these particular sites. It was concluded that all eight sites could be avoided. These sites were presented to the Advisory Council. The latter commented upon the proposed avoidance of the sites via the Memorandum of Agreement. Prior to mining activity this same procedure must be completed for each new area of the ConPaso Project which Intervenors propose to mine.

This incremental procedure set forth in the Memorandum of Agreement is consistent with the procedure outlined in 36 C.F.R. Part 800.6(1) (1977). It is implicit in reviewing the Memorandum that the Council considers this "undertaking," the ConPaso Project, as a "comprehensive" plan that requires subsequent action (archeological clearances) by the USGS, a Federal agency.

The Council has stated in the Memorandum itself that "its comments or approval (extends) only to the undertaking as reviewed," the 720–acre priority tract. Finally, the Memorandum makes it clear that "subsequent action related to the undertaking," the additional archeological clearances and proposed mining areas, "(will be) submitted to the Council for review in accordance with Part 800.4(e)."

The 1979 revision of these regulations, effective as of March 31, 1979, was in effect when the 1978 Mining Plan was approved. It makes the validity of the procedure adopted for the ConPaso Project through the Memorandum of Agreement even more apparent. 36 C.F.R. Part 800.6(d)(8) (1979), the offspring of Part 800.6(1) (1977), states:

> When the Council has met and commented upon an undertaking that will require *subsequent site–specific undertakings* by a Federal agency, the Council's comment extends only to the undertaking as reviewed... (emphasis added).

Those subsequent "site–specific undertakings"[59] are the incremental components of the Project which will be surveyed to locate sites which will then be inventoried, evaluated and nominated to the Federal Register if deemed eligible. The Advisory Council will then be able to comment upon the proposed mitigation and avoidance plans prepared for each new segment prior to the commencement of mining in that sector. If, during the actual mining operations, new sites are discovered in the mining sector those sites will be protected under the Historic and Archeological Data Preservation Act. *See,* 36 C.F.R. Part 800.7(a) (1979).

The Advisory Council has acknowledged that the procedure for compliance with Section 106 of NHPA which has been outlined

---

**57.** A Memorandum of Agreement constitutes the Advisory Council's comments pursuant to Section 106. 36 C.F.R. Parts 800.6(a) (1977) and 800.6(c)(3) (1979).

**58.** All eight sites have been subsequently enrolled.

**59.** These subsequent "site–specific undertakings" were explicitly recognized in the Memorandum of Agreement wherein it states that "prior to commencement of any project–related undertaking, locate, identify, and evaluate all archeological ... resources ... within the area of impact that appear to meet the Criteria for listing in the National Register...." Memorandum of Agreement, para. I.A.

in the Memorandum of Agreement satisfies the requirements of Section 106.[60] The Advisory Council's interpretation of Section 106 has been consistent since the 1974 regulations were promulgated and does not violate the clear meaning of NHPA. *WATCH*, 603 F.2d at 324. Congress had the opportunity to review the Council's interpretation of Section 106 in 1976 when it amended that section. Congress chose not to alter the Council's interpretation. Therefore, this Court must give "great weight" and "considerable deference" to the Advisory Council's interpretation of Section 106 as set forth in the regulations. *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 107, 99 S.Ct. 1601, 1612, 60 L.Ed.2d 66 (1979); *Teamsters v. Daniel*, 439 U.S. 551, 566 n.20, 99 S.Ct. 790, 800 n.20, 58 L.Ed.2d 808 (1979); *Trafficante v. Metropolitan Life Ins.*, 409 U.S. 205, 210, 93 S.Ct. 364, 367, 34 L.Ed.2d 415 (1972); *Udall v. Tallman*, 380 U.S. 1, 16–18, 85 S.Ct. 792, 801–802, 13 L.Ed.2d 616 (1965); *Hiatt Grain & Feed*, 602 F.2d at 933.

The Court concludes that the Advisory Council's interpretation of Section 106 as incorporated in the regulations and as applied to the ConPaso Project, is reasonable. Therefore, the procedure for compliance with NHPA adopted for this project is upheld.

*EXECUTIVE ORDER 11593.* Plaintiffs allege that Executive Order 11593 was violated because all of the archeological sites on the leasehold were not evaluated for National Register eligibility prior to July 1, 1973.[61] Defendants and Intervenors contend that this order is a presidential "managerial tool" and was not intended to be judicially–enforceable by private parties.

The courts have held that in order for an executive order to be judicially–enforceable it must have the force and effect of law and it must create a private cause of action. *Independent Meat Packers Ass'n v. Butz*, 526 F.2d 228, 234–36 (8th Cir. 1975), cert. denied, 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976); *Farkas v. Texas Instrument, Inc.*, 375 F.2d 629, 632 (5th Cir. 1967), cert. denied, 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 471 (1967); *Farmer v. Philadelphia Electric Co.*, 329 F.2d 3, 7–8 (3d Cir. 1964); see, *Acevedo v. Nassau County, New York*, 500 F.2d 1078, 1083–84 (2d Cir. 1974). Two courts have construed Executive Order 11593 as having the force and effect of law and as creating a private right of action.[62] *Barcelo v. Brown*, 478 F.Supp. 646, 694 (D. Puerto Rico 1979); *Aluli v. Brown*, 437 F.Supp. 602, 609 (D.Haw.1977), rev'd on other grounds, 602 F.2d 876 (9th Cir. 1979).

A review of the relevant case law and the provisions of Executive Order 11593 convinces the Court that this order does not have the force and effect of law and was not intended to create a private cause of action for its enforcement. For an executive order to have the force and effect of law, it must be issued "pursuant to a statutory mandate or delegation of authority from Congress." *Independent Meat Packers*, 526 F.2d at 234. The president cannot confer that authority upon himself. See, *Youngstown Co. v. Sawyer*, 343 U.S. 579, 585–88, 72 S.Ct. 863, 865–867, 96 L.Ed. 1153 (1952); *Independent Meat Packers*, 526 F.2d at 235. In both *Barcelo* and *Aluli*, the courts made conclusory comments that Executive Order 11593 derived its force and effect of law from NEPA, NHPA and other historic preservation acts. See, *Barcelo*, 478 F.Supp. at 694 n.107; *Aluli*, 437 F.Supp. at 608.

**60.** *See,* Intervenors' Summary Judgment, Exhibit No. 21.

**61.** Section 2 of Executive Order 11593 provides:
(T)he heads of Federal agencies shall:
(a) no later than July 1, 1973, with the advice of the Secretary of the Interior, and in cooperation with the liason officer for historic preservation for the State or territory involved, locate, inventory, and nominate to the Secretary of the Interior all sites, buildings, districts, and objects that appear to qualify for listing on the National Register of Historic Places.

**62.** A third case which applies the provision of Executive Order 11593 does so without discussing whether the order was intended to have the force and effect of law or create a private cause of action. *See, Save the Courthouse Committee v. Lynn*, 408 F.Supp. 1323 (S.D.N.Y.1975).

The Executive Order states in its preamble that its authority stems from NEPA, NHPA, and other historic preservation laws. There is no specific citation in either the district court opinions or in the order itself to pin down this grant of authority. Perusal of the statutes cited reveals the absence of any directive to the President to issue executive orders having the force and effect of law.

The *Aluli* court concluded that Executive Order 11593 allowed for a private cause of action for its enforcement. 437 F.Supp. at 609. This holding was adopted by the court in *Barcelo* without further analysis. *See,* 478 F.Supp. at 694. The district court in *Aluli* based its conclusion on the rationale that "(a)lthough neither NHPA nor Executive Order 11593 expressly grants a private right of action, such action can be said to be clearly implied since it is necessary to effectuate the purpose of both the act and the order." 437 F.Supp. at 609. The *Aluli* court cited *Acevedo* and *Save the Courthouse* in support of this rationale.

This Court believes that the *Acevedo* rationale was misapplied in *Aluli*. In *Acevedo* the court did state that a private cause of action "may be inferred when necessary to effectuate the purpose of a statute or regulation." 500 F.2d at 1084. However, the court went on to state that "where the source of the statute or regulation has been silent, courts do not lightly infer such rights." *Id.* In *Acevedo*, the court did not infer such a right with reference to the executive order before it. As mentioned earlier,[63] the court in *Save the Courthouse* did not address the issue as to whether the Executive Order 11593 was enforceable through a private cause of action.

As in *Acevedo*, the Court sees "no need to find an implied right of action that would extend to (Plaintiffs)" in the case at bar. *See,* 500 F.2d at 1084. Executive Order 11593 has two major components which are not merely repetitions of the provisions of NHPA. The first of these is that all eligible sites are to be protected according to the provisions of Section 106.[64] *See,* Executive Order No. 11593, Section 2(a) and (b). Second, all sites "appear(ing)" to qualify for inclusion on the National Register were to be located, inventoried and nominated no later than July 1, 1973. Executive Order No. 11593, Section 2(a). The first component of the executive proclamation was incorporated into Section 106 by the 1976 amendment which extended NHPA's protection to archeological sites that were deemed "eligible for inclusion in the National Register." 16 U.S.C. Section 470f. Therefore, it is evident that at least as of 1976 when this amendment was enacted there was "no need" for a private cause of action to protect "eligible" sites by way of this executive order since those sites are protectable by a private cause of action directly under Section 106 and NHPA. Indeed, the fact that Congress apparently saw the need to formally elevate this portion of the presidential proclamation to statutory status may be taken as evidence that Congress did not consider this order standing alone as having the force and effect of law.

The second major component of Executive Order 11593, and the one which Plaintiffs have pressed before this Court, is the July 31, 1973, deadline by which all sites that "appear to qualify for listing in the National Register of Historic Places" were to have been located, inventoried and nominated to the Secretary of the Interior for inclusion in the Register.[65] Executive Or-

---

**63.** *Id.*

**64.** Prior to the 1976 amendment, Section 106 was applicable only to a "district, site, building, structure or object that (was) *included* in the National Register." 16 U.S.C. Section 470f, as enacted in 1966 (emphasis added).

**65.** Plaintiffs insist that Section 2(a) required Defendants to locate, inventory and nominate

all eligible sites on the Leasehold area over four years before the 1976 Lease was approved.

However, the Executive Order is silent as to whether the term "appear" was intended to refer to all sites or only sites known to exist. Evidently the Council has interpreted Section 2(a) as applying only to known sites. *See,* 36 C.F.R. Part 800.1(b)(3) (1979). This provision implies recognition by the Council that it may be some time before all sites are discovered and

der No. 11593, Section 2(a). This self–imposed deadline is a "managerial" tool or deadline directed solely to the federal agencies and was not intended to give rise to a separately enforceable private action. The Advisory Council is directly accountable to the President for its administration of Executive Order 11593 and NHPA.[66] And so also are the federal agencies which have been charged by the President with the responsibility of "administer(ing) the cultural properties under their control in a spirit of stewardship and trusteeship." [67] If the President decides that the Council or the federal agencies are proceeding too slowly to comply with his order or NHPA, this is a matter for his attention and not for the Court.

Executive Order No. 11593 does not have the force and effect of law. To the extent that the President may have intended that this order be given the force and effect of law relative to the July 31, 1973, deadline, to that extent the "President's order does not direct that a congressional policy be executed in a manner prescribed by Congress–it directs that a presidential policy be executed in a manner prescribed by the President." *Youngstown*, 343 U.S. at 588, 72 S.Ct. at 867.

Further, Executive Order No. 11593 was not intended to create a private cause of action. The Court specifically concludes that the July 31, 1973, deadline was a "managerial tool" for the benefit only of the executive branch. Therefore, the portions of Plaintiffs' Amended Complaint which are brought pursuant to this order must be dismissed.

■■ *HADPA.* In the Third Cause of Action, Plaintiffs allege a violation of the Historic and Archeological Data Preservation Act of 1974 (HADPA), 16 U.S.C. Section 469 *et seq.* Plaintiffs contend that paleontological surveys should have been completed for the entire leasehold prior to either lease approval or mining plan approval.[68] Plaintiffs misunderstand the function of the HADPA. The function of HADPA differs from that of NHPA.

NHPA is essentially a "procedural tool," 36 C.F.R. Part 60.2(c), whose function culminates during the planning stage and terminates, as to each phase of a project, upon the commencement of construction. *See*, 36 C.F.R. Part 800.7(a) (1979). The Advisory Council has interpreted HADPA, on the other hand, to be a substantive tool whose function is initiated by the commencement of construction and runs coterminous with the construction. *Id.* The Council's interpretation of HADPA is consistent with the statutory wording and, although not of longstanding duration, is entitled to "some weight" by this Court. *See, WATCH*, 603 F.2d at 324.

The function of HADPA, as interpreted by the Council, makes HADPA a substantive complement to NHPA. It secures preservation of historic and archeological resources discovered during the construction phase of a project. 36 C.F.R. Part 800.7(a) (1979). HADPA also ensures that paleontological resources, which are categorically beyond the scope of NHPA's jurisdiction, will be preserved and protected during construction. 16 U.S.C. Section 469a–1.

Plaintiffs' contention that HADPA has not been complied with is a premature proposition. There is no cause of action in this case based upon HADPA and there cannot be until "construction," in this case mining, actually commences.

*MISCELLANEOUS.* The Fourth Cause of Action is based upon allegations of a separate violation of NEPA due to violations of NHPA, Executive Order 11593, and HADPA. Since the Court has concluded that there have been no violations of those

that, therefore, the 1973 deadline was meant to apply only to known sites.

**66.** The Advisory Council is composed of eleven members of the President's cabinet, heads of other federal agencies and presidential appointees. *See*, 16 U.S.C. Section 470i.

**67.** Exec.Order No. 11593, Section 1(1).

**68.** *See*, n.39, *supra*.

provisions, this ground urged by Plaintiffs fails.

The Fifth Cause of Action was voluntarily dismissed by Plaintiffs prior to the hearing on the Motion for a Preliminary Injunction.[69]

■ *INDISPENSABILITY OF THE NAVAJO TRIBE (FIDUCIARY DUTY).* In the Sixth Cause of Action, Plaintiffs allege that the Secretary's approval of the ConPaso Project constitutes a breach of a fiduciary duty claimed owing to the individual Plaintiffs by Defendants.[70] The merits of this claim cannot be reached since a determination of this issue involves a party indispensable to its resolution–the Navajo Tribe.

■ The Court will now reconsider the indispensability of the Navajo Tribe pursuant to Rule 19(b), Federal Rules of Civil Procedure, 28 U.S.C.[71] Although neither Defendants nor Intervenors reasserted the indispensability issue at the hearing, it is within the Court's discretion to resurrect this issue *sua sponte* at this time. *See, State Farm Mut. Auto. Ins. Co. v. Mid–Continent Cas. Co.,* 518 F.2d 292, 294 (10th Cir. 1975); *Quabaug Rubber Co. v. Fabiano Shoe Co., Inc.,* 567 F.2d 154, 158 n. 4 (1st Cir. 1977); *McShan v. Sherrill,* 283 F.2d 462, 464 (9th Cir. 1960); 3A Moore, Federal Practice para. 19.19 (1978). Furthermore, a court may apply the indispensability standards of Rule 19(b) to less than all of the causes of action brought in a lawsuit. *See, Chiodo v. General Waterworks Corporation,* 380 F.2d 860, 866–867 (10th Cir. 1967). Therefore, the Court will reconsider its order denying dismissal for failure to join the Navajo Tribe solely as it pertains to this cause of action.

The Court's earlier denial of the motions to dismiss for nonjoinder of the Tribe was based upon the holding in the Tenth Circuit case of *Manygoats, supra.* In *Manygoats,* the Court of Appeals held that a suit brought by individual members of the Navajo Tribe alleging violations of NEPA should not be dismissed for failure to join the Tribe itself. The plaintiffs in *Manygoats* were seeking to enjoin the then–pending Secretarial approval of a mining lease on tribal lands for alleged failure to comply with NEPA. The Tenth Circuit held that the suit should proceed without the presence of the Tribe on the rationale that:

> Dismissal of the action for nonjoinder of the Tribe would produce an anomalous result. No one, except the Tribe, could seek review of an environmental impact statement covering significant federal action relating to leases or agreements for development of natural resources on Indian lands.[72] NEPA is concerned with national environmental interests. Tribal interests may not coincide with national interests. We find nothing in NEPA which excepts Indian lands from national environmental policy.... In equity and good conscience the case should and can proceed without the presence of the Tribe as a party. 558 F.2d at 559 (footnote added).

The case at bar is factually similar not only to *Manygoats,* but also to another Tenth Circuit case, *Tewa Tesuque v. Morton,* 498 F.2d 240 (10th Cir. 1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1353, 43

---

**69.** *See,* n.4, *supra.*

**70.** The legal component of Plaintiffs' breach of trust claim is based upon the following characterization of the law:

> As members of a federally–recognized Indian tribe (the Navajo Tribe) each individual plaintiff is subject to the guardian–ward relationship existing between the United States as trustee, and Indian people.
> As the guardian of the individual plaintiffs herein, the United States is bound by traditional fiduciary duties running to each plaintiff. Amended Complaint, para. 93–94.

**71.** Defendants and Intervenors have previously filed motions to dismiss for failure to join an indispensable party: the Navajo Tribe. These motions were denied on August 3, 1979.

**72.** This conclusion stems from the proscription against making the Navajo Tribe an involuntary party to a lawsuit due to its immunity from suit. *Manygoats,* 558 F.2d at 557; *Cherokee Nation v. State of Oklahoma,* 461 F.2d 674, 681 (10th Cir. 1972), *cert. denied,* 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 489 (1972).

L.Ed.2d 440 (1975). Both *Manygoats* and *Tewa Tesuque*, like the present case, were suits by individual members of an organized Indian community against Interior officials seeking to prevent the effectuation of a lease agreement involving community lands and to which the community as an entity was a party. In *Tewa Tesuque*, 50 members of the Pueblo of Tesuque sought cancellation of a lease entered into between the Pueblo and a developer. The agreement had the prior approvals of both the Secretary of the Interior and the Pueblo.[73] The district court dismissed the action for failure to join the Pueblo as an indispensable party and the Court of Appeals affirmed, stating:

> As lessor of the lease agreement entered into with Sangre (the developer), the Pueblo will certainly be affected if the lease is cancelled. Therefore, it is an indispensable party. 498 F.2d at 242.

In *Manygoats*, the Tenth Circuit distinguished *Tewa Tesuque* on two bases. First, in *Tewa Tesuque*, plaintiffs had attacked an existing lease to which the Pueblo was a party, whereas, in *Manygoats* all that was sought was the enjoining of the Secretary from approving a pending lease. In *Tewa Tesuque* the assault was directed at the lease; in *Manygoats* it was aimed at the Secretary's approval of the lease. Second, in *Manygoats* the cause of action was

brought under NEPA, whereas NEPA was not considered by the court in *Tewa Tesuque*.[74]

Consideration of the two distinctions between *Tewa Tesuque* and *Manygoats* in this case aids the Court in its resolution of indispensability. As to the first distinguishing basis, and while the point may be an exceedingly fine one, the present case is more similar to *Tewa Tesuque* than *Manygoats*.[75] This case, like *Tewa Tesuque*, involves an attempt to terminate an existing lease.[76]

It was the second basis of distinction noted in *Manygoats* which led that court to a holding on indispensability diametrically opposed to the one rendered in *Tewa Tesuque*. However this may be, the resemblance between the present case and *Manygoats* vanishes with the dismissal of the NEPA claims in this case.[77] The policy considerations underlying the holding of *Manygoats* have already been secured in the present case. In the Tribe's absence, the Plaintiffs have been able to contest fully the alleged NEPA violations, and these policy considerations are not relevant to the breach of trust claim.

The determination of indispensability [78] is made with reference to four criteria set forth in Rule 19(b) as follows:

> First, to what extent a judgment rendered in the person's absence might be

**73.** The first cause of action in *Tewa Tesuque* was for "breach of trust by federal officials in negotiating and approving the lease...." 498 F.2d at 242.

**74.** A violation of NEPA has been alleged by the plaintiffs in *Tewa Tesuque*; however, the Tenth Circuit held that the claim was mooted by an earlier ruling in *Davis v. Morton*, 469 F.2d 593, *supra*, which had been decided with reference to the same lease agreement involved in *Tewa Tesuque*. 498 F.2d at 243.

**75.** In this case, Plaintiffs are seeking to have the Secretary's approval of the 1976 Lease rescinded, which would at minimum suspend implementation of the lease indefinitely. Plaintiffs are also seeking to have the Assistant Secretary's approval of the 1978 Mining Plan rescinded, which would also stymie the lease's implementation.

**76.** Had the Secretary in *Manygoats* approved the lease prior to the filing of the suit, the rationale of *Manygoats* compels the conclusion

that NEPA interests must still prevail over tribal interests to permit the maintenance of a NEPA action, as was done by Plaintiffs in this case. *See*, 558 F.2d 559. To hold otherwise would result in the same anomaly envisioned and proscribed in *Manygoats* and make the viability of a NEPA action involving tribal lands dependent upon the arbitrary timing of lease approval rather than the sufficiency of environmental compliance.

**77.** In addition to having already decided the NEPA–related issues, the resolution of the NHPA and HADPA issues renders moot any inquiry as to whether actions brought pursuant to these statutes, like NEPA, should be permitted in the absence of the Tribe.

**78.** Before a court undertakes to determine whether a given party is indispensable under Rule 19(b), there must be a preliminary determination under Rule 19(a) that the party is a necessary party. Fed.R.Civ.P. 19(b). An Indian tribe is deemed to be a necessary party in a

prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

As to the first factor, the Court concludes that the Navajo Tribe could easily be prejudiced by any judgment rendered in its absence on the Sixth Cause of Action. The statutory requirement of Secretarial approval for a mining lease on Indian lands [79] places upon the Secretary the responsibility of safeguarding the interests of the Indian people in such a lease. *United States v. 9,345.53 Acres of Land, Etc.*, 256 F.Supp. 603, 605 (W.D.N.Y.1966), *rev'd on other grounds sub nom. United States v. Devonian Gas and Oil Company*, 424 F.2d 464 (2d Cir. 1970); *see, Davis v. Morton*, 335 F.Supp. 1258, 1260 (D.N.M.1971), *rev'd on other grounds*, 469 F.2d 593 (10th Cir. 1972). The Intervenors and the Tribe would each clearly be prejudiced by a decision in this case that either the 1976 Lease or the 1978 Mining Plan were not in the best interests of the Navajos. Either negative determination would lead to rescission of the Secretary's approval and the resultant abeyance of the lease without any guarantee of its subsequent revival. As in *Tewa Tesuque*, this could mean the loss of tribal revenue derived from the lease [80] and the loss of employment opportunities for tribal members.[81] Also, in the absence of the Tribe it is unthinkable and improper to allow these individual complainants to attack the Secretary's determination as to what is best for the Navajo people concerning this lease. Obviously, the Tribe's viewpoint as to what

is best for the Navajo people respecting the use of *tribal* lands is of premiere importance. A decision rendered in its absence, in neglect of that viewpoint, would be greatly prejudical to the Tribe and its members. Additionally, Intervenors have already made advance royalty payments to the Tribe under the terms of the lease in the amount of 5.6 million dollars. What becomes of these monies in the event that the lease terminated without production?

As to the second factor, in *Tewa Tesuque* the court succinctly concluded that there could be no lessening of the prejudical impact if the lease were cancelled. 498 F.2d at 242; *accord, Lomayaktewa*, 520 F.2d at 1326. That same conclusion is applicable in this case because the Court would be unable to assuage the prejudicial effects associated with the Secretary's rescission of the lease and mining plan approvals.

As to the third factor, the court in *Tewa Tesuque* held that any judgment rendered in the Pueblo's absence would not be adequate since it was "very likely" that there would be more lawsuits. 498 F.2d at 243. It is equally likely in this case that additional lawsuits will ensue if judgment on this cause of action were rendered in favor of Plaintiffs.

As to the final factor and the adequacy of Plaintiffs' remedy if this action is dismissed, the court in *Tewa Tesuque* found that there was an adequate remedy for plaintiffs in that case before the tribal council. The Tenth Circuit stated that the existence of intra–tribal relief was:

> very critical in light of our well–established policy–rule that courts will not interfere with the internal workings of Indian tribes. *Motah v. United States*, 402 F.2d 1 (10th Cir. 1968); *Prairie Band of Pottawatomie Tribe of Indians v. Puck-*

suit affecting leases of tribal lands. *Manygoats*, 558 F.2d at 558; *see, Tewa Tesuque*, 498 F.2d at 242; *Lomayaktewa v. Hathaway*, 520 F.2d 1324, 1326 (9th Cir. 1975), *cert. denied, Susenkewa v. Kleppe*, 425 U.S. 903, 96 S.Ct. 1492, 47 L.Ed.2d 752 (1976). Therefore, the Court concludes as a matter of law that the Navajo Tribe is a necessary party to this lawsuit under Rule 19(a).

**79.** *See*, n. 7, *supra*.

**80.** The estimated revenue accruing to the Tribe over the entire life of the proposed project is 3.83 billion dollars.

**81.** A total of 1,014 Navajo jobs will be established when the mine is in full operation yielding an estimated three–fourths of a billion dollars in income to individual members of the Tribe over this project's duration.

*kee,* 321 F.2d 767 (10th Cir. 1963). An internal dispute such as this should be decided by the tribal council of the Pueblo and not by the courts. 498 F.2d at 243; *accord, Yazzie v. Morton,* 59 F.R.D. 377, 385 (D.Ariz.1973).

It is immaterial that at this point Plaintiffs can probably not get the Tribe to rescind its approval of the lease or the mining plan since the Tribe has already executed the lease and approved the mining plan. This same situation existed in *Tewa Tesuque* where the lease agreement had been fully executed prior to the lawsuit. 498 F.2d at 242. Plaintiffs could have challenged the beneficiality of the project to the Burnham Chapter and the Navajo people through tribal channels prior to tribal approval. If the Court were to entertain this cause of action at this time, the Court would, in effect, be allowing Plaintiffs to disregard the Tribe's right to be the final arbiter and, thereby, the final spokesman for intra–tribal affairs through a procedure characterized by one court as a "back door method of ... attempting to represent the tribe without approval or authority." *Yazzie,* 59 F.R.D. at 379. This would be in direct contravention of the policy articulated in *Tewa Tesuque.*[82] Thus, the Court concludes that all factors weigh in favor of indispensability of the Navajo Tribe.

Furthermore, even if this fourth factor weighed in favor of Plaintiffs because their tribal remedies might be non–existent or ineffectual, the Court would weigh all the factors and reach the same result. The potential prejudice to the Tribe, Intervenors and Defendants resulting from a judgment for Plaintiffs on the Sixth Cause of Action far outweighs any prejudice to these Plaintiffs. *See, Lomayaktewa,* 520 F.2d at 1326–27. The Sixth Cause of Action must, accordingly, be dismissed.

Another ground for dismissing the Sixth Cause of Action is that, just as in *Tewa Tesuque,* it is evident that this cause of action is "in reality an unconsented suit

against the United States barred by the doctrine of sovereign immunity." 498 F.2d at 243.

The Court's Findings of Fact and Conclusions of Law consist of those included in this Opinion and those filed by the Court on May 9, 1980, in conjunction with Plaintiffs' Motion for an Injunction Pending Appeal. *See,* Fed.R.Civ.P. 52(a).

IT IS, THEREFORE, THE ORDER OF THIS COURT that the First, Second, Third, and Fourth Causes of Action be, and they are hereby, dismissed, with prejudice.

IT IS THE FURTHER ORDER OF THIS COURT that the Sixth Cause of Action be dismissed for failure to join an indispensable party under Fed.R.Civ.P. 19(b).

IT IS THE FURTHER ORDER OF THIS COURT that Plaintiffs' request for a Permanent Injunction be, and it is hereby, denied.

---

**82.** *Manygoats* did nothing to erode this policy since the court in *Manygoats* found that environmental interests associated with alleged NEPA violations were national in scope, necessarily implying that these interests transcended

the realm of intra–tribal concern. Therefore, *Manygoats* was not a case wherein the policy of tribal sovereignty for resolution of internal strifes was pertinent.